UNITED STATES of America,
Plaintiff,

v.

NATIONWIDE TRAILER RENTAL SYS-
TEM, Inc., George Croft, Sr., and
A. E. Simon, Defendants.

Civ. No. W-655.

United States District Court
D. Kansas.

Nov. 29, 1957.

William C. Farmer, U. S. Atty., Sam-
uel Flatow and George H. Schueller, U.
S. Dept of Justice, for the Government.

Clyde M. Simon, Wichita, Kan.,
Arnold, Fortas & Porter, William T.
Stephens, Washington, D. C., for de-
fendants.

HILL, District Judge.

The Court makes the following Find-
ings of Fact and Conclusions of Law in
the above-entitled case:

Findings of Fact.

1.

Nationwide Trailer Rental System,
Inc., hereinafter referred to as NTRS, is
a non-profit corporation organized under
the laws of Michigan. Its corporate pur-
pose as stated in the Articles of Incorpo-
ration is "to associate together, for their
mutual benefit, comfort and instruction
not involving direct pecuniary profit,
those persons actively engaged in utility
trailer rentals."

2.

A. E. Simon is a member of the de-
fendant NTRS, and at the time of filing
of the complaint herein, August 28, 1953,
was its Secretary-Treasurer, George A.
Croft is a member of the defendant
NTRS and at the time of the filing of
the complaint was its President.   Since

that time and at the February, 1955 convention of the defendant NTRS, new officers have replaced the above-mentioned as such officers.

### 3.

The defendant Simon is a resident of Wichita, Kansas, and the defendant NTRS and the defendant Croft appeared in court by counsel and also in person in the case of Mr. Croft. During the time Mr. Simon was Secretary-Treasurer of NTRS, the business of NTRS has been conducted from Wichita, Kansas.

### 4.

All the members of the defendant NTRS are engaged in what is known as the "one way" trailer rental business. The trailers are two and four-wheel trailers of various sizes suitable and intended for use with private passenger automobiles. In the operation of this business, customers regularly rent these trailers from members of defendant NTRS, and other businessmen not members of NTRS for use in transporting personal goods and private property from one place to another. The somewhat unique feature of the "one-way" business is that the businessman who rents the trailer to his customer does not contemplate that the trailer will be returned to him, but through arrangement with other businessmen, directs the customer to leave the trailer at another station, at or near the destination of the customer.

### 5.

This practice of allowing a customer to surrender a trailer to a station other than the one from which it was rented, as described above, originated in California. There is some evidence that there were individuals engaged in the business in California during the period of World War Two. At any rate the evidence shows that between 1945 and 1950, the practice began to find its way into other parts of the United States.

### 6.

Between 1945 and 1950, trailers were exchanged on a "one way" basis in a rather loose fashion. It appears from the evidence that for a long period of time prior to 1945, individuals had been engaged in the rental of utility trailers on a local basis. These local trailer rental people were the natural avenues through which the "one way" practice developed. The evidence showed that in the early development of the "one way" business, operators or local businessmen who had been exposed in one way or another to the one-way idea, when they had a customer desiring to rent a trailer on a one-way basis to a given city where the rentor had no contact, would make use of the telephone directories and write or otherwise communicate with businessmen in that city who were engaged in the rental of local trailers.

### 7.

In this manner, the businessman started a trailer out on what he hoped would be a series of "one way" moves. In order to give the business man to whom the trailer was sent some information about where the trailer could be sent on another "one way" journey, trailer owners who had sent their trailers to others on a one-way basis, compiled lists of operators who were willing to accept trailers from others on a one-way basis. The trailers always remained, and do remain under the present system, the property of the original owner.

### 8.

The transactions outlined in Findings 6 and 7 above happened many times over a period of time beginning about 1945 and continuing at least until 1950, and perhaps longer. As a result more than one "list" came into existence. The evidence is not clear, but it is a fair inference that some operators had agreements with others whereby they were to be mutual recipients of the others' one-way business. Perhaps several operators on a list had that understanding. What is clear from the evidence is that some operators objected to having their trailers sent to certain other operators. This did happen sometimes however. Some operators were on all lists. Occa-

sionally these operators who were on all lists would receive trailers from operators on one list and then use the wrong list when re-renting the trailer with the result that the owner-operator's trailer passed into the hands of people with whom he did not desire to do business.

### 9.

In conjunction with the development of the lists and other business practices outlined above, arrangements were made for a division of the rental fee between the rentor and the owner. There was some testimony that with each list of operators there was a price list. There was no testimony concerning the division of rentals during this period.

### 10.

There was testimony that many trailers which were circulated by these businessmen were not first class trailers and that the operators were unwilling to release their best trailers into the one-way operations. No direct evidence was offered of any specific accidents which occurred as a result of this tendency to circulate trailers of low quality, but there was evidence of near accidents and other road failures.

### 11.

The evidence showed that while there was never a static period during the development of the business as it spread over the country, eventually there emerged seven lists. These lists were compiled by the larger operators and changed often, perhaps monthly.

### 12.

The evidence showed that in 1950 a few businessmen engaged in the circulation of trailers on a one-way basis conceived the idea of the formation of a single "list" of operators willing to exchange trailers with each other. Pursuant to that objective, invitations were sent to individuals to a meeting looking to that end which was to be in Detroit. This meeting was not well attended. In fact only Mr. M. C. Hansen, an operator located in Detroit, Mr. Bennett of Phila-

delphia and Mr. Richard Shunk, of Cleveland, were present. The evidence was that not much of any consequence transpired at that meeting, and no evidence of any agreements survives.

### 13.

After that above referred to meeting had ended, two of the participants, Mr. Shunk and Mr. Bennett, invited trailer operators to a meeting in Indianapolis. Every operator, or nearly every operator whose name was on any of the lists was invited. In all 101 invitations were extended. The evidence was that 26 operators attended the meeting.

### 14.

As a direct result of this meeting, the defendant NTRS was incorporated; it was incorporated early in 1951. Either at this meeting or at a meeting of the Board of Directors of the newly formed corporation, a set of by-laws were adopted. At the meeting in Indianapolis, the as yet unincorporated association elected officers. These officers became the incorporators and officers of the defendant NTRS.

### 15.

The following by-laws have been in force in substantially the form set out below at least since the 1952 convention of the association which was held in St. Louis, among other by-laws. (Those set out below are taken from the amended by-laws of the association dated February 11, 1955)

Article III entitled "Eligibility for Membership." Section 1: No member of Nationwide Trailer Rental System may be connected with other one-way trailer rental system in competition with our association members.

Article IV, entitled "Application for Membership." Section 3: A member shall be protected from any application within his city or immediate vicinity as long as there are no official complaints against him. Unless the member consents, in writing, it shall be the duty of the secretary to deny such applications

Article VI, entitled "Loss of Qualification." Section 3: Other offenses: The Board of Directors of the N.T.R.S. for good cause shown and with notice of hearing, may place a stop order or expel any member from this System if, in the opinion of the Board of Directors, such action shall be necessary to keep this System out of legal entanglements or to preserve the good name and business of the System.

Section 4: Violation of any of the By-laws of this organization is cause for expulsion from the System. Expulsion shall be only by a two-thirds vote of the Directors or by a two-thirds vote of those present at a regular meeting. Any member expelled shall be given 90 days in which to get his trailers out of the System. Evidence of guilt shall be established by complaints of members of the Nationwide Trailer Rental System. Complaining member must be able to back up his charges with direct and lucid evidence.

Section 5: Members, who sell their trailer business to new owners may transfer their membership to the new owner, providing purchaser meets qualifications set forth in these By-Laws and is Approved by the Board of Directors.

### 16.

The evidence showed that at the outset, it was difficult to induce businessmen to join the newly formed association. This was partly due to the fact that individuals engaged in the local utility trailer rental business were unfamiliar with the "one-way" operation and principle and partly due to the fact that some towns where NTRS desired a representative had no utility trailer people in business there at all and therefore no prospects for membership in NTRS.

### 17.

The evidence also showed that many operators had a few trailers in the system or being circulated while others had a great many. Due to the disparity between the number of trailers in circulation by the various members, and the situation as outlined in Finding 16, at the St. Louis Convention referred to in Finding 15, members of the NTRS were divided into classes. This classification appears to have undergone changes after its initiation, as more fully appears hereafter. Immediately below are the current by-laws of the association relative to the classification of members.

Article V entitled "Classification of Membership."

Section 1: Every member shall own one station in the one-way rental system.

Section 2: Class A Member: All individuals, firms or corporations conducting a trailer rental business and having a minimum of ten trailers active in the N.T.R.S. and approved by the Board of Directors.

Section 3: Class B Member: All individuals, firms or corporation (s) conducting a trailer rental business not having a minimum of ten trailers in the N.T.R.S. Limitations on one-way trailers: "B" members must have the approval of the Board of Directors in order to put ten or more trailers into the one-way system.

Section 3a: Six (6) months from the passage of this amendment, present "B" members shall not be able to Change their status to "A" members until the next convention. With the exception of the previous Section, no changes to "A" status shall be made between the passage of this amendment and the next convention.

Section 4: Class C Stations: All individuals, firms or corporations conducting a trailer rental business as a subsidiary station of a Class A member by authority of the Board of Directors.

Article X entitled "Voting and Elections."

Section 1: Each Class "A" member shall have one vote upon all questions presented for any action at any meeting of the members.

Section 2: There shall be no vote for any Class "B" member at any meeting.

Section 3: There shall be no vote or voice for any Class "C" station at any meeting.

**18.**

As indicated in previous findings, the above by-laws represent the present status of members. It appears from the evidence that there was a time when "B" members were voting members and when what are now referred to as "C" stations, were considered members, although they may not have had any vote in convention meetings. It also appears from the evidence that prior to the passage of the by-laws in their present form, in February, 1955, "B" members could become "A" members simply by placing 10 or more trailers in circulation.

**19.**

The Association has a Board of Directors and an Executive Committee. The Board of Directors are elected from among the "A" members and two of the members of the Board of Directors serve on the Executive Committee which has three members, the Third being the President of the N.T.R.S.

**20.**

The Board of Directors is empowered by the By-Laws to make rules for N.T.R.S. They are empowered to grant authority to the Executive Committee except that the Executive Committee shall not be given authority to expel a member or grant a membership.

**21.**

Pursuant to the authority contained in the By-Laws, various rules and other items germane to this lawsuit were adopted by the Board of Directors or proposed by them and adopted by the membership in convention. A uniform lease agreement was adopted for use by the members. A suggested rate schedule was adopted and circulated to all members. The rate schedule was revised at least once and the one currently in effect is what is known as a "zoned rate schedule" in the business.

**22.**

The current lease form contains a lease agreement which is used by all operators, who are members of NTRS. Also, printed on the lease form itself and a part of each leasing contract is a provision for overtime charge and the amount which will be charged therefor. There was no evidence that any operators did not use this lease form. It is supplied to the operators free of charge by NTRS.

**23.**

The current "Rate Schedule" establishes "zones" from which a rate is obtained. Each operator, to use this chart, would "zone" a map of the United States, and number the zones outward from his city beginning with one (1). Each zone is roughly 135 miles from border to border. In other words, a series of concentric circles with the operator's home town as the center of each circle (on a map) would be first drawn. Then, a rent figure could be established quickly by simply observing the zone of the destination city on the map.

**24.**

As regards the above referred to "price list," the evidence was and it is specifically found as a fact that the members of the NTRS did not strictly adhere to the price list. Nor was there any punishment ever inflicted for deviation. In fact, no evidence of any agreement to adhere to the price list was introduced. The price schedule was "adopted" by the association. The schedule itself was referred to carefully by the defendants as a "suggested" price schedule. The extent of the agreement concerning the price list was that it be circulated to all members. Several witnesses characterized the price list as a guide, "something to go by." The Court is unable to find that the list was circulated for no purpose at all.

**25.**

The Board of Directors have adopted rental instructions which require the members to divide the rental fee in accordance with a fixed rule. The defend-

ant NTRS receives for operating expenses 5%· of all rental fees collected. The remainder is divided between the renting station and the owner.

26.

At the time of the trial of this case, the evidence showed that there were upwards of 30,000 trailers circulating in the one-way business in the United States at that time. More than one-third of these trailers are owned by members of the defendant NTRS and circulate exclusively in that system.

27.

At the close of the evidence, the latest figures on the membership of the defendant NTRS were offered in evidence. Those figures are as follows: Class "A" Members 168, Class "B" Members 63, Class "C" Stations 524. These members are located in 46 states and the District of Columbia. One member of NTRS testified that an average trailer would make 15 moves a year. These trailers are regularly taken by customers from state to state.

Conclusions of Law.

1.

This court has jurisdiction of the parties and the subject matter of the action pursuant to 15 U.S.C.A. §§ 9, 22.

2.

The defendants are engaged in interstate commerce.

3.

A substantial portion of the One-Way trailer industry is affected by the agreements under consideration.

4.

■ The complaint charges a violation of the Sherman Anti-Trust Act, Section 1, 15 U.S.C.A. § 1. It is not necessary that all the parties to an agreement or combination be made defendants in an action of this type, it is enough if the non-defendant parties to the alleged violation are sufficiently identified as to satisfy the requisites of fair notice of what is charged in the pleadings.

5.

The defendant NTRS is not an integration of the business of its members. It is not a sole marketing or selling agency through which its members operate. It is rather an organization for the "mutual benefit, comfort, and instruction" of its members.

6.

The individual defendants and all the other members of NTRS must be considered as individual business units. The By-Laws of the defendant NTRS constitute an agreement between the defendants. By virtue of the by-laws, rental instructions issued by the Board of Directors and the Executive Committee are also agreements between the members.

7.

■ Article IV, Section 3, of the By-Laws of NTRS violates the Sherman Act, 15 U.S.C.A. § 1, in that it establishes exclusive territories for each member and empowers that member to prevent any other operator from becoming a member in his area, and thereby competing for the business of the other members of the defendant NTRS.

8.

■ The individual defendants and the members of the defendant NTRS are engaged in a price fixing scheme which is illegal per se in two particulars. The rate charged for overtime use of trailers is uniformly charged by all operators and is a part of the printed portion of the lease agreement. The Court concludes that the publication, adoption, and circulation of the schedule, while not fixing a rigid price, was such a tampering with prices as is forbidden by the Sherman Act.

9.

■ Article VI, Section 3, violates the Sherman Act by providing for a boycott. This By-Law is a violation of the act per se.

10.

The Nationwide Trailer Rental System, Inc., is in effect an extra-govern-

mental body seeking to regulate the One-Way Trailer Rental Industry represented by its membership.

It is suggested by the Court that no decree be prepared and entered at this time but that the case be set down for arguments of counsel as to the nature of the decree to be entered on the basis of the foregoing Findings of Fact and Conclusions of Law.

### Final Judgment.

Plaintiff, United States of America, having filed its complaint herein on August 28, 1953; the defendants having appeared herein and filed their answers to said complaint on October 22, 1953, and their amended answer on April 15, 1954; and this cause having come on for trial March 7, 1955, and said trial having been completed March 16, 1955; and the Court having filed its findings of fact and conclusions of law on July 2, 1955.

Now Therefore, It Is Hereby Ordered, Adjudged and Decreed as Follows:

### I.

This Court has jurisdiction of the subject matter hereof and of the parties hereto. The complaint states a cause of action against the defendants and each of them under Section 1 of the Act of Congress of the 2nd of July 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act, as amended.

### II.

As used in this Final Judgment:

(A) "One-way trailers" means any two or four-wheel trailers of various sizes suitable and intended for use with passenger automobiles, to transport personal goods and other property from one place to another. One-way trailers do not include housetrailers.

(B) "One-way trailer rentals" means rentals of trailers made Under terms and conditions which enable the renter to surrender the trailer to an operator at a designated station in the City of the renter's destination.

(C) "Operators" means owners of one-way trailers who operate lots at which one-way trailers are rented or returned.

(D) "Class C Stations" means individuals, firms or corporations not owning any one-way trailers but conducting a trailer rental business as a subsidiary station or agent of an operator who is a member of defendant Nationwide.

(E) "Nationwide" means Nationwide Trailer Rental System, Inc., a defendant in this cause.

### III.

The defendants, and each of them, have violated and are now violating Section 1 of the Act of Congress of July 2, 1890 (26 Stat. 209, 15 U.S.C.A. § 1), entitled "An act to protect trade and commerce against unlawful restraints and monopolies," as amended, commonly known as the Sherman Act, by engaging in a combination and conspiracy to restrain competition in the trade and commerce among the several States of the United States in one-way trailer rentals.

### IV.

The provisions of this Final Judgment applicable to defendant Nationwide shall apply to that defendant and to the officers, directors, agents, members, employees, successors and assigns of said defendant.

### V.

The defendant Nationwide is enjoined and restrained from:

(A) Adopting, continuing, enforcing or adhering to any by-law, regulation, instructions, rule, requirement, understanding, plan or program which, directly or indirectly, requires or suggests that any operator shall follow or adhere or conform to any list or schedule of rental rates or of suggested rental rates for one-way trailers, or by any other means fixing, determining, suggesting or maintaining rates or other terms or conditions for rental of one-way trailers; provided, however, that any one-way trailer operator, as to trailers owned by him, may determine and communicate to other one-way trailer operators the

rate or rates at, and the terms and conditions under which such one-way trailers may be rented or the rentals divided between the owner and the renter of such trailers; and provided, further, that the defendant Nationwide may provide that each member receiving rentals for one-way trailers owned by any other member or by any non-member shall pay a certain, uniform part of percentage of such rentals to the trailer owner;

(B) Establishing or allocating exclusive territories or exclusive locations for one-way trailer operators, or in any other manner restricting, or preventing, or attempting to restrict or prevent any person from engaging in the trade of one-way trailer rentals at any place or places of his choosing;

(C) Restricting or preventing, or attempting to restrict or prevent any person from dealing with any other person or group of persons engaged in the trade of one-way trailer rentals;

(D) Hindering, restricting, or preventing any person from joining or remaining a member of any association or organization of one-way trailer operators.

## VI.

Defendant Nationwide is ordered and directed to:

(A) Grant uniform and non-discriminatory membership in Nationwide, upon written application therefor, to any one-way trailer operator; provided that the applicant:

(1) Agrees to meet and meets his financial obligations to defendant Nationwide, to members of said defendant, and to the public; and

(2) Agrees to maintain and maintains adequate standards for the safety of one-way trailers.

(B) Provide in its by-laws that any member of Nationwide may be expelled only upon substantial proof to the Board of Directors of defendant Nationwide that such members:

(1) substantially violated the lawful by-laws of Nationwide; or

(2) failed to fulfill his financial obligations to Nationwide or its members.

(C) Provide in its by-laws that a member may be suspended temporarily by the Board of Directors and expelled by a majority of the members present at a meeting; provided that such member be given notice, a hearing, and the right to appeal from a suspension, and that, upon his request, the Board of Directors shall put the matter of his expulsion on the agenda of the first membership meeting following such request.

(D) Within 120 days after the date of entry of this final judgment, to amend its by-laws so as to bring them into conformity with this final judgment.

(E) Within 60 days after the date of entry of this final judgment to eliminate from its rules, lease forms, and rental instructions any provisions that are inconsistent with the provisions of this Final Judgment.

(F) Within 30 days from the date of entry of this Final Judgment to mail to each of its present members and to each existing Class C station a copy of this Final Judgment.

(G) For a period of five years commencing on the date of entry of this Final Judgment, to mail a copy of this Final Judgment to each new member and to each newly created Class C station.

## VII.

For the purpose of securing compliance with this Final Judgment and for no other purpose, duly authorized representatives of the Department of Justice shall, upon written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, and upon reasonable notice to the principal office of defendant Nationwide, be permitted, subject to any legally recognized privilege:

(A) access, during the office hours of said defendant, to all books, ledgers, accounts, correspondence, memoranda, minutes and other records and documents in the possession or under the control of said defendant relating to any of the

matters contained in this final judgment, and

(B) subject to the reasonable convenience of the said defendant and without restraint or interference from it, to interview officers and employees of said defendant, who may have counsel present, regarding such matters.

## VIII.

Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to the Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the amendment, modification or termination of any of the provisions hereof, for the enforcement of compliance therewith and for the punishment of violation thereof.

## IX.

Judgment is entered against the defendants for all costs to be taxed in this proceeding.