The **GRAY LINE, INC.**, a California corporation, Plaintiff,

v.

**GRAY LINE SIGHTSEEING COMPANIES ASSOCIATED, INC.**, a Maryland corporation, et al., Defendants.

Civ. No. 43667.

United States District Court . N. D. California, S. D.

Sept. 23, 1965.

McCutchen, Doyle, Brown, Trautman & Enersen, and William Schwarzer and Craig McAtee, San Francisco, Cal., for plaintiff.

Berol, Loughran & Geernaert, Littler, Mendelson & Saltzman and with Robert

Littler, San Francisco, Cal., and William A. Roberts, Washington, D. C., for defendants.

### WOLLENBERG, District Judge.

This case involves the validity under the Antitrust laws of an article of a membership agreement which provides that members of a nationwide sightseeing Association will not compete amongst each other in their respective allotted territories. Plaintiff, as member of the Association, has entered a motion for summary judgment asking for injunctive or declaratory relief under Section 1 of the Sherman Antitrust Act, 15 U.S.C.A. § 1.

### FINDINGS OF FACT

Plaintiff, The Gray Line, Inc., a California corporation, and a wholly owned subsidiary of Greyhound Lines, Inc., is engaged in the sightseeing business in the San Francisco area and elsewhere in Northern California and does business as Gray Line of California. Defendant, Gray Line Sightseeing Companies, Associated, Inc., [hereinafter "the Association"] is a non-profit, non-stock corporation incorporated in Maryland, with its principal place of business in Chicago, and offices in New York and San Francisco.

The Association is composed of nationwide members who are independent sightseeing companies or operators. The function and business of the Association is that of conducting a trade Association to further the sightseeing business of its members. The stated purposes of the Association as set forth in its Certificate of Incorporation include the following:

"To conduct a trade association for the purpose of establishing and maintaining consistent and sound business ethics and practices of the various persons, firms and corporations in the several states of the United States of America and in foreign countries engaged in the business of sightseeing and tour service; to render the traveling public reliable, dependable, and efficient service in connection with the same; and to secure uniformity of action."

The Association publishes and circulates an annual copyrighted sightseeing tariff which describes in detail the services offered by each member. The tariff is circulated internationally and enables tourists and travel agents throughout the United States and the world to plan sightseeing trips and excursions in advance. The Association has offices in San Francisco, Chicago, and New York in which its agents are engaged in the promotion of the sightseeing business of its member companies and of the good will of the Association, in handling reservations, and in the sale of tickets, including prepaid coupons sold in the name of the Association and accepted by all member companies.[1] Thus a New York citizen can buy a prepaid ticket from the Association in New York for guided tours to be conducted by various members in Chicago, Los Angeles, and San Francisco.[2] (See Plaintiff's Exhibit A.)

---

1. Q. "What is the purpose of the Association?"

 A. [Mr. Sullivan, West Coast Regional Sales Representative of the Association] "It's to provide a unified sales effort and identification for the companies as a standard in sightseeing. They publish a common tariff. They have a common, what they call a 'prepaid offer', which could be used by travel agents, transportation companies, which will be accepted by all these companies. They have a common advertising program, and they have sales offices of which I run the San Francisco office." From Testimony before the Interstate Commerce Commission in San Francisco.

2. From time to time various persons have been hired as sales representatives to act on behalf of the Association and its members as a promoter of sales. At the present time, Edward Sullivan is designated and salaried at $17,500 per annum to act as sales representative of the Western Division with the title of "Regional Vice President—Sales." (Plaintiff's Exhibit A). Sullivan, under the control of the President of the Association, (See provision 5, Employment Contract, Exhibit A) runs a permanent sales office at 291 Post Street in San Francisco.

The Association is the exclusive owner of several collective trademarks for service registered on the Principal Register of the United States Patent Office. The right to use the trademark and name is granted by the Association to members on a territorial basis. Each member is given the *exclusive* right to the franchise in its respective territory and in turn promises not to compete against another member in its assigned territory. Article 15 of the Membership Agreements (a form contract) provides:

> "Said member shall have the exclusive right to operate and otherwise carry on all sight-seeing business in and from the City of _____. It is the express purpose of this agreement that no member shall compete against another member in his assigned territory, and the use of the Gray Line name or trademark in competition against another member in his rightful territory shall be construed as a violation of the terms of the agreement."

The provisions of Article 15 are supported and enforced by Section 4.5 of the Association's by-laws which authorize the Association's Board of Directors to expel any member for violation of the membership agreement. (Exhibits D and G to the Complaint).

This particular action is brought by plaintiff, Gray Line, Inc. in an effort to secure protection from threatened punitive action against it by the Association and its members. The asserted grounds for the Association's punitive action is that another subsidiary of Greyhound (which is the parent of plaintiff, Gray Line Inc.) is seeking to enter the sightseeing business in Southern California in competition with a member of the Association, Tanner Company, which has the exclusive franchise and is presently operating in the Los Angeles area.[3] Tanner has filed a complaint with the Association charging that plaintiff, Gray Line, Inc., has violated the Association's membership agreement by invading the Tanner Company's territory through its affiliate Southern California Sightseeing Company. Shortly thereafter the Board of Directors of the Association voted 15 to 1 in favor of holding a hearing to consider the expulsion of plaintiff from the Association. On June 4, 1965, this court issued a preliminary injunction restraining the Association from suspending or expelling plaintiff from membership. The injunction also included a condition barring plaintiff's affiliate, "S.C.S.C." from commencing competitive sightseeing operations in Southern California while the action was pending. Plaintiffs come before this court now on a motion for summary judgment, praying that the provisions not to compete included in Article 15 of the Membership Agreements be declared invalid and unenforceable.

## CONCLUSIONS OF LAW

This court has jurisdiction over the parties and the subject matter of the action pursuant to 15 U.S.C.A. §§ 9, 22.

■ The record is clear that the business of the Association is nationwide and that the sightseeing business in which

---

The office is listed in the San Francisco telephone book under "Gray Line Sightseeing Companies Associated" in both the alphabetical section and classified section under the heading "Sightseeing Tours". Sullivan devotes at least half his time to promoting sales for Grayline members and employs staff members who are assigned full time to activities on behalf of the Association's member firms. Prepaid package orders can be purchased at the San Francisco office to be exchanged for a sightseeing ticket for an Association member's tour in each city the purchaser visits.

3. In 1964 Greyhound organized Southern California Sightseeing Co. Inc. (S.C.S.C.) a California corporation, for the purpose of having that company engage in the sightseeing business in the Los Angeles Area. After unsuccessful attempts to buy the Tanner Company's properties, the S.C.S.C. filed an application on March 3, 1965 with the Public Utilities Commission of the State of California for authority to engage in sightseeing activities in Southern California (Defendant's Item No. 1).

defendants are engaged involves interstate activity and communications in considerable volume.[4] The Association's sales staff and nationally distributed tariff exist for the very purpose of selling the prospective sightseer a ticket for sightseeing in a distant city before he ever leaves home. "If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." United States v. Womens Sportswear Mfg. Ass'n, 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949), Accord Southerland v. St. Croix Taxicab Association, 315 F.2d 364 (3rd Circuit, 1963).

Secondly, the Northern District of California is a proper place of venue under 15 U.S.C. § 22 which provides that an antitrust case against a corporation may be brought in any district where it transacts business. In accordance with the findings of fact above, this Court concludes that the Association has an office in San Francisco and is doing business through its Sales Representative, Sullivan, sufficient to confer jurisdictional nexus and to establish venue in this judicial district, International Shoe Co. v. State of Washington, etc., 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).

Article 15 of the Association's membership agreement supported by Article 4 of the Association's by-laws is *illegal per se* under Section 1 of the Sherman Act because it establishes exclusive territories for each member and empowers the Association to police the allotted territories through the general power of expulsion by vote of the Board of Directors.[5] The arrangement of the Association for allocating territories among its members and requiring strict adherence is the type of scheme which has been repeatedly and consistently condemned by the courts since the very inception of the Sherman Act as a per se violation. Where such arrangements exist, the rule of reason has no application. Once they raise their heads, the courts will strike them down.

"No citation of authority is any longer necessary to support the proposition that a combination of competitors, which by agreement divides the world into exclusive trade areas, and suppresses all competition among the members of the combination, offends the Sherman Act." United States v. National Lead Co., 63 F.Supp. 513, 523 (S.D.N.Y.1945), Aff'd 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077.

Evidence of justification, necessity, good faith, or beneficial results is immaterial and will not be heard. United States v. Aluminum Co. of America, 148 F.2d 416, 427 (2nd Cir. 1945), United States v. Addyston Pipe and Steel Co., 85 F. 271, 291 (6 Cir.), Fashion Originators Guild of America v. Federal Trade Commission, 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949 (1941). Thus all of the evidence submitted in defendant's brief and oral argument concerning the high standards of the Association, the convenience of its tariff, the advantages of uniformity and safety requirements and the security of the unknowing tourist is immaterial to the issue of the validity of Article 15. If these admittedly beneficent results can be achieved by voluntary and cooperative planning among members of the Association or through the lawful licensing of the Gray Line trademark, they are welcome. However, these ends must not be reached through

---

4. Plaintiff in his Complaint for Injunction asserted that the Association is the largest sightseeing organization in the world and that the total volume of sightseeing business done by the members of the Association is in excess of $10,000,-000 per year, a substantial part of which involves persons travelling in interstate commerce.

5. The exclusive licensing arrangement itself is not illegal. However, when the licensing arrangement is coupled with the covenants not to compete, the total scheme precludes all competition between members of the Association and violates Section 1.

suppression of competition by dividing up the sightseeing market. No amount of temporary gains in the sightseeing industry can repair the damage done, when the natural laws of the market place are tampered with by private individuals acting as an extra-governmental body.

■■ Furthermore, defendant's Association cannot use its trademark as a shield from the per se doctrine. Restraints of trade through exclusive territorial divisions cannot be justified as necessary steps taken to implement a valid trademark licensing system. Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951). While the trademark does afford protection to the Gray Line name and does support exclusive licensing to a single member in each city (where no monopoly is created), the agreements not to compete in the present case go far beyond the scope of legitimate protection inherent in a trademark. Cf. International Salt Co. v. United States, 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20 (1947), United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942), United States v. General Electric, 80 F. Supp. 989 (S.D.N.Y.1948).

Defendants urge this court to reject the mechanical application of the per se doctrine by summary judgment and instead to apply a test of whether the restrictive covenants were fundamental or ancillary to an otherwise valid licensing arrangement. They cite the cases of United States v. Sealy, Inc. (N.D.Ill.Oct. 1964), In the Matter of Carvel Corporation et al. (July 19, 1965) F.T.C. Order Docket No. 8574 and White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963) as examples of judicial and administrative reluctance to ap-

ply a per se doctrine to territorial arrangements in favor of a reasonableness approach. This court feels that defendants' reliance on these cases is inappropriate. The thrust of the White Motors Co. case and its progeny, is that territorial limitations on a vertical plane between a manufacturer-distributor and its retail dealers are not invalid per se; instead their legality should only be determined after trial. This line of cases recognizes certain situations where a licensor or manufacturer in a *vertical agreement* may have a legitimate and protectible interest in controlling the territories within which its licensees or distributors operate.[6] No such vertical agreement exists in this case. The arrangement charged in the complaint and viewed as a whole is the functional equivalent of a pure horizontal agreement to allocate territories among competitive companies. The association is concededly not an integration of the business of its members. It is rather a non-profit trade association for the mutual benefit and business interests of its individual members who must be viewed as independent business units. Therefore, the individual membership agreements between each member and the Association constitute, in aggregate, horizontal agreements between the members inter se. These horizontal agreements to divide up exclusive territories of operation within which the members covenant not to compete fall directly under the per se sword of Sherman Act, Section 1. United States v. Nationwide Trailer Rental System, 156 F.Supp. 800, (D.Kan.1957) Affirmed 355 U.S. 10, 78 S.Ct. 11, 2 L.Ed.2d 20 (1957).

■ Defendant's contention that plaintiff is barred from declaratory relief merely because plaintiff is itself a member of the Association is unsound.[7] Unit-

---

6. One such situation would occur where the various distributors of a manufacturer's product could only survive economically if granted an exclusive territory in which to operate free of competition from other distributors of the same product. With the guarantee of an exclusive territory, the distributors might be better able to compete against dis-

tributors of different but competitive brands. Thus the sacrifice of intra brand competition in this situation might well increase inter brand competition. Cf. White Motor Co. v. United States. No analogous circumstances exist in the case before this court.

7. No contention is made by defendants in the pleadings that the plaintiff is or has

ed Cigar-Whelan Stores Corp. v. H. Weinreich, 107 F.Supp. 89 (S.D.N.Y.1952). I do not imply that plaintiff comes to court with lily white hands. Plaintiff was undoubtedly aware of the impact of Article 15 when it joined the Association and now is seeking the best of both worlds in asking the court to strike the restrictive covenants while preserving the exclusive licensing arrangements. However, the public interest in the private enforcement of the antitrust laws clearly and indisputably outweighs the application of the *in pari delicto* defense in this case. See Waldron v. British Columbia Petroleum Co., D.C., 231 F.Supp. 72, 90–92. Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947). For the immediate business interests of the plaintiff are not the only interests which suffer as long as the covenants not to compete exist. In striking the illegal provision of Article 15 from all of the membership agreements this court also has in mind the sightseer who, as the ultimate consumer, pays the price of artificial barriers to competition. If, in the total public interest, smaller members of the Association need protection from saturation of the sightseeing market by huge companies like Greyhound, Inc., the Public Utilities Commission or various State licensing agents are empowered to protect them through denial of applications to enter the market. Such regulation is ultra vires for an Association of private companies.

## FINAL JUDGMENT

 Inasmuch as there is no dispute as to the terms of the Membership Agreement and by-laws of the Association, this case is appropriate for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Since the illegal provision is fixed and very much

in effect (as indicated by the existing lack of competition among members and the action of the Association in response to Tanner Company's complaint) the case is now ripe for declaratory judgment. South Side Theatres, Inc. v. United West Coast Theatres Corp., 178 F.2d 648, 651 (9th Cir. 1949).

 The provisions of this final judgment are applicable to defendant, Gray Line Sightseeing Companies Associated, Inc., and to its member companies individually. It is not necessary that all the parties to an agreement or combination be made defendants in an action under Section 1 of the Sherman Antitrust Act; "it is enough if the non-defendant parties to the alleged violation are sufficiently identified as to satisfy the requisites of fair notice of what is charged in the pleadings." United States Nationwide Trailer Rental System, supra, at p. 805.

It is therefore ordered and decreed that so much of Article 15 of the membership agreements as precludes competition between members of the Association, their affiliates, subsidiaries or divisions, is invalid, illegal and void. The Association and its members are hereby restrained and enjoined, now and in the future, from directly or indirectly enforcing any scheme which prohibits all competition between members in the same territory. This order is not intended to affect the validity of the exclusive licensing of the Gray Line trademark[8] or other provisions of the Membership Agreements or by-laws. However, a member of the Association or its affiliate owning the Gray Line trademark in one territory is heretofore free to compete without the trademark against another licensed Association member in a different territory.

---

been a party to *enforcement* of the anti-competitive provision of Article 15. See Connolly v. Union Sewer Pipe Co., 184 U.S. 540, 22 S.Ct. 431, 46 L.Ed. 679 (1902).

8. This court does not at this time find the exclusive licensing arrangement to be

violative of the antitrust laws since no evidence was submitted that the arrangement tends to create a monopoly. It is solely the restrictive covenants not to compete even without the trademark, which run afoul of Section 1 of the Sherman Act.