INTERNATIONAL SOCIETY FOR KRISHNA CONSCIOUSNESS, INC., and Govinda Das, on behalf of themselves and all International Society for Krishna Consciousness members, Plaintiffs,

v.

James R. ROCHFORD, Superintendent of Chicago Police Department, et al., Defendants.

No. 76 C 1615.

United States District Court, N. D. Illinois, E. D.

Jan. 21, 1977.

Barry A. Fisher, Fleishman, Brown, Weston & Rohde, Beverly Hills, Cal., Edwards, Haney, Singer & Stein, Chicago, Ill., for plaintiffs.

William R. Quinlan, Corporation Counsel, Chicago, Ill., for defendants.

## MEMORANDUM

### I

LEIGHTON, District Judge.

This suit seeks a declaratory judgment and injunctive relief against enforcement of regulations adopted by the airport commissioner of the city of Chicago. The complaint alleges that because the regulations lack procedures guaranteeing due process, and give airport officials unbridled power to grant or deny permits, they are unconstitutional and abridge rights secured by the First Amendment to the federal constitution. For jurisdiction in this court the suit relies on 28 U.S.C. §§ 1331, 1343(3)(4) and prays for relief pursuant to 28 U.S.C. §§ 2201, 2202. It is alleged that the amount in controversy exceeds $10,000, exclusive of interest and costs. And contending that there is no material issue of fact in the case, plaintiffs, with supporting affidavit, have moved for summary judgment, incorporating by reference a brief filed in support of a motion for preliminary injunction.

Defendants have answered the complaint, and supported by an affidavit, oppose the motion. In a memorandum, they contend that plaintiffs attack the regulations facially and as they are applied in the daily administration of O'Hare Airport. Therefore, defendants insist that there are factual issues to be resolved before the case can be decided. These contentions require this court to determine whether the pleadings, affidavits, and memoranda show that there is no genuine issue concerning any material fact; and whether plaintiffs are entitled to judgment as a matter of law. The facts are as follows.

### II

Plaintiff International Society of Krishna Consciousness is a non-profit religious corporation which espouses the views of Krishna Consciousness and maintains temples and schools throughout the world. It requires its devotees to perform a religious ritual called Sankirtan, one consisting, in part, of activities that spread the religion's truths through solicitation of contributions, dissemination of religious tracts, and sale of religious materials. For some time, members of Krishna have performed this ritual in the public areas of O'Hare Airport, an international air transportation complex in Chicago. Govinda Das, whose legal name is Robert H. Lindberg, is an ordained priest of the religion, a vice-president of its Chicago Temple, and performs Sankirtan at O'Hare, a course of conduct he desires to continue in the future. James Rochford is the superintendent of police of the city of Chicago and enforces the regulations in question. William R. Quinlan is the city's corporation counsel and prosecutes those who violate the regulations. The city of Chicago adopted the regulations which plaintiffs allege violate their First Amendment rights.

O'Hare Airport is owned by the city of Chicago, subject to its ordinances, and operated by the department of aviation, an executive arm of the city government established in 1958 by section 8.2–1, chapter 8.2 of its municipal code. The department is headed by a commissioner of aviation who is responsible for the management, control of design, operation and maintenance of all Chicago airports. O'Hare has 72 departure gates that handle, more or less, 1800 flights daily. It employs 33,000 persons; and some 100,000,000 passengers, visitors and employees use its facilities yearly. Over 18,000,000 transit passengers change planes at O'Hare each year. Portions of the airport are leased to airlines and concessionaires. These include lobbies and areas open to the general public without restriction.

Effective March 29, 1976, acting under the authority given him by the city's municipal code, and in consultation with airport officials, the commissioner of aviation

adopted regulations for all airports under his jurisdiction. Notices were posted in airport administrative offices and at O'Hare telling all persons desiring to solicit funds or distribute literature at airports to comply with the following rules, a true and correct copy of which was attached by plaintiffs to their complaint and is referred to by defendants in their affidavit opposing summary judgment.

## AIRPORT REGULATIONS

## DEPARTMENT OF AVIATION

Pursuant to the authority vested in the Commissioner of the Department of Aviation of the City of Chicago by Chapter 8.2 of the Municipal Code of the City of Chicago, and in order to balance the rights of the traveling public and those who have a right to be in public places to publicize their views, the following regulations are adopted, to be effective immediately. These regulations are intended to accomplish goals of:

—assuring fair use of facilities in Chicago's airports by passengers and persons accompanying them, employees, lessees, and persons and groups wishing to publicize their views;

—preventing interference with the right of passengers to free access to the airport travel facilities and the free passage among those facilities;

—discouraging interference with persons who are required to wait in lines;

—preventing interference with hijack and other security measures;

—permitting equitable access among persons and groups desiring to publicize their views.

### 1

Persons authorized by law to distribute literature, or solicit contributions may do so only in public areas of Chicago airports, provided that they may not do so in the following areas:

A. All aircraft departure lounges and concourses leading to them including concourses A through K;

B. All concourses leading to the terminal buildings including the rotunda;

C. At, in, at the entrance to, or exit from:

(1) hijack, search, and security areas;

(2) ticket counters;

(3) baggage pickup or collection areas;

(4) washroom areas;

(5) areas leased to concessionaires and other lessees except by permission of such lessee;

(6) elevators, escalators, moving walkways; and

(7) main terminal doors and vestibules.

D. At locations where persons are in line at or before areas described in subparagraph C.

### 2

A. No person shall distribute literature or solicit contributions unless he shall have registered beforehand with the airport manager or his authorized representative for each day such activities are engaged in.

B. Between 9 a.m. to 9:30 a.m. each day each person who desires to distribute literature or solicit contributions shall register in person with the airport manager or his authorized representative, who shall allot reservations for each day in the sequence each person registers. Each person shall give his name and address as well as the organization or purpose he represents and the terminal in which he will be on that day.

C. Each person registered shall receive from the airport manager or his authorized representative a badge or insignia in a form prescribed by the airport manager. Such badge or insignia shall be valid only for the day issued. It shall be worn at all times by the bearer while at the airport, and in a manner visible to the public. It shall not be transferred to another person, and shall be destroyed by the bearer when he leaves the airport at the end of the day.

**3**

A. No person except concessionaires and other lessees as permitted by contract with the City of Chicago shall sell anything for commercial purposes.

B. No person shall make a noise or create other disturbances which interferes with the ability of others to hear public announcements or interferes with the transaction of business with airlines, concessionaires, or lessees.

C. No person shall interfere with the free passage to, or access of, other persons to corridors, entrances, doorways, or offices or airport facilities.

D. No individual shall be solicited by more than one person at a time.

E. No person shall erect a table, chair, or other structure other than in the leased space.

**4**

The airport manager of his authorized representative may declare an emergency on account of unusually congested conditions in the airport terminals caused by weather, schedule interruptions, extremely heavy traffic movements or other causes, or on account of emergency security measures. In such case an announcement shall be made. All persons distributing literature or soliciting contributions as permitted under paragraph I and II shall immediately cease such activities for the duration of such emergency.

**III**

These, then, are the regulations in question. The parties agree to this fact. They also agree that at O'Hare Airport plaintiffs engage only in the ritual they call Sankirtan: the solicitation of contributions, distribution of religious tracts, and the sale of religious materials. But they disagree on the construction of the regulations.

Plaintiffs contend they are unconstitutional, facially and as applied because they lack procedures guaranteeing due process and give airport officials unbridled power to deny permits and thus prevent plaintiffs'

enjoyment of their First Amendment rights at O'Hare by the practice of their religious ritual. It should be observed that the contention asserting the regulations are " * * unconstitutional facially * * * " means that a mere reading of them will disclose the claimed defect; while the contention asserting the regulations " * * * are unconstitutional * * * as applied * * * " can mean only their application to the activities in which plaintiffs engage at O'Hare. Bearing directly on this latter meaning, defendants contend that there are material issues of fact to be resolved in this case. But the thrust of their argument is to support the contention that the regulations are constitutional; that they were adopted to protect the public in the use of Chicago airports; and that they do not abridge any of the freedoms plaintiffs enjoy under the First Amendment.

Therefore, a dispute exists between the parties concerning construction of the regulations; but it is not a dispute as to a material fact; it is one that presents only a question of law. *Atchison, Topeka & Santa Fe Ry. Co. v. City of Chicago,* 136 F.Supp. 476, 480 (N.D.Ill.1955) reversed on other grounds 7 Cir., 240 F.2d 930; compare *Bricklayers, Etc., U. 15, Fla. v. Stuart Plaster Co., Inc.,* 512 F.2d 1017 (5th Cir. 1975). Where a decision turns on the meaning of words in a statute or regulation, a legal question is presented for the court to decide. *Bingham's Trust v. Commissioner of Internal Revenue,* 325 U.S. 365, 65 S.Ct. 1232, 89 L.Ed. 1670 (1945); *Northern Natural Gas Company v. O'Malley,* 277 F.2d 128 (8th Cir. 1960); see 82 C.J.S. *Statutes* § 312 (1953). Therefore, when the question presented is only a legal one requiring examination of municipal regulations to determine their constitutionality, the issue is appropriate for summary judgment proceedings. See *Gray Line, Inc. v. Gray Line Sightseeing Companies Associated, Inc.,* 246 F.Supp. 495 (N.D.Cal.1965). Of course, there are well-established principles of constitutional law that serve as predicates in determining whether municipal regulations are unconstitutional.

## IV

Our federal constitution, through the 1st and 14th Amendments, establishes that neither Congress nor the legislature of a state, can make any " \* \* \* law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press \* \* \*." U.S.Const. Amends. I, XIV; see *Jones v. City of Opelika,* 316 U.S. 584, 62 S.Ct. 1231, 86 L.Ed. 1691 (1942). Implementing this rule of the constitution, it has been recognized that hand distribution of religious tracts is an age-old form of missionary evangelism; it is more than preaching; it is more than distribution of religious literature. Its purpose is as evangelical as the revival meeting; and as a form of religious activity, it occupies the same estate under the First Amendment as do worship in churches and preaching from pulpits. And the mere fact that religious literature is sold, or contributions solicited, does not put this form of evangelism outside the pale of constitutional protection. *Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); *International Soc. for Krishna Con. v. City of New Orleans,* 347 F.Supp. 945 (E.D.La.1972).

This is not to intimate nor suggest that any conduct can be made a religious ritual and by the zeal of practitioners be swept into the protection of the First Amendment. *Reynolds v. United States,* 98 U.S. 145, 25 L.Ed. 244 (1878); *Davis v. Beason,* 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637 (1890). In fact, it is settled in our constitutional law that a municipality has the power to protect its citizens from undue annoyance by regulating the solicitation of contributions and canvassing for converts. See *Schneider v. New Jersey,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939). Only recently, Mr. Chief Justice Burger, speaking for the court in a context slightly different from the one at bar, had occasion to say that "[a] narrowly drawn ordinance, that

does not vest in municipal officials the undefined power to determine what messages residents will hear may serve these important interests without running afoul of the First Amendment." *Hynes v. Mayor and Council of Borough of Oradell,* 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976). For First Amendment requirements, there is no difference between an ordinance and a set of regulations adopted pursuant to municipal authority. Consequently, the question to be decided is whether the regulations adopted by the airport commissioner of the city of Chicago meet the test of these constitutional principles.

## V

In proceeding to the decision, this court observes that the regulations in question consist of five parts: the first, an introductory paragraph with five subdivisions; the next four, a series of paragraphs with Roman numeral designations.[1] It is said in the introductory paragraph that the regulations are for Chicago airports. And, as is common knowledge, Chicago has three airports: Meigs, near the Loop, a small one with one airstrip; Midway, in the southwest side of the city, an airport with several concourses and more than one airstrip but which cannot accommodate large jets; and O'Hare, in the far northwest side, with many concourses and a number of airstrips capable of accommodating transcontinental jets.

The first part begins with the declaration that the regulations are intended to assure fair use of airport facilities by " \* \* \* passengers, and persons accompanying them, employees, lessees, and persons and groups wishing to publicize their views \* \* \*." The remaining subparagraphs of this part state that the regulations are intended to foster the goals of "preventing interference with the right of passengers to free access to the airport

---

1. As published by the commissioner, the regulation, after the introductory paragraph, has four parts designated by Roman numerals, I to IV. Each contains alphabetically designated subparagraphs; and in one instance there are Arabic subdivisions in parentheses. In this memorandum, in order not to confuse the Roman numeral subdivisions of the regulations with the text, the four parts have been redesignated in Arabic, 1 to 4.

travel facilities, and the free passage among those facilities; discouraging interference with persons who are required to wait in line; preventing interference with hijack and other security measures; permitting equitable access among persons and groups desiring to publicize their views." The regulations do not define nor make clear what is meant by these expressions. Whose "employees" and what "lessees" are not defined nor specified. Without question, the First and Fourteenth Amendments apply to government-owned airports like Meigs, Midway and O'Hare. *Chicago Area Military Project v. City of Chicago,* 508 F.2d 921 (7th Cir. 1975); *cert. denied,* 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483; cf. *International Soc. Krishna v. Dallas-Ft. W. Reg. Air. B.,* 391 F.Supp. 606 (N.D.Tex.1975). Apparently, the draftsman of these provisions recognized this principle when it was stated, laudably, that " * * * in order to balance the rights of the traveling public and those who have a right to be in public places to publicize their views, the following regulations are adopted * * *." However, in *Interstate Circuit v. City of Dallas,* 390 U.S. 676, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968), Mr. Justice Marshall, speaking for the court, pointed out that "[v]agueness and the attendant evils we have earlier described * * * are not rendered less objectionable because the regulation of expression is one of classification rather than direct suppression. * * * Nor is it an answer to an argument that a particular regulation of expression is vague to say that it was adopted for [a] salutary purpose * * *." 390 U.S. at 688–89, 88 S.Ct. at 1306. Therefore, stating the purpose of these regulations, even the declaration of a salutary one, will not cure the evils of vagueness if they are present in an attempt to restrict the enjoyment of First Amendment freedoms. See *Wolin v. Port of New York Authority,* 392 F.2d 83 (2d Cir. 1968), *cert. denied,* 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275.

 The second part begins with a paragraph which states that "[p]ersons authorized by law to distribute literature, or solicit contributions may do so only in public areas of Chicago airports, provided that they may not do so in the following areas * * *." Then, in a series of subparagraphs, the prohibited areas are said to be "[a]ll aircraft departure lounges and concourses leading to them including concourses A through K [and] [a]ll concourses leading to the terminal buildings including the rotunda." Included in the prohibited areas are those "[a]t, in, at the entrance to, or exit from" places where contributions can be solicited or literature distributed, such as " * * * hijack, search, and security areas; ticket counters; baggage pickup or collection areas; washroom areas; areas leased to concessionaires and other lessees except by permission of such lessee; elevators, escalators, moving walkways; and main terminal doors and vestibules." The list of proscribed areas ends with "[l]ocations where persons are in line at or before areas described in [the previous subparagraph]." Again, it is not stated whether the areas referred to are at Meigs, Midway or O'Hare; whether, for example, there are "concourses A through K" at all Chicago airports is not made clear. Whether all Chicago airports have "concourses leading to the terminal buildings including the rotunda" is similarly unclear. Nor is it clear where are the locations of the "public areas of Chicago airports" after the prohibited areas are taken into account. It is not explained what the regulations mean by "[p]ersons authorized by law to distribute literature, or solicit contributions * * *." These words suggest there are persons authorized by law to distribute literature and solicit contributions and some who are not. Therefore, the regulations are at least ambiguous "because in certain respects 'men of common intelligence must necessarily guess at [their] meaning'." *Hynes v. Mayor and Council of Borough of Oradell,* 425 U.S. 610, 96 S.Ct. 1755, 1760 (1976). It is well established that vague words in a statute, ordinance, or regulation proscribing enjoyment of First Amendment rights are the equivalent of outright prohibition of free speech. See *National Association of Letter Carriers v. Blount,* 305 F.Supp. 546 (D.D.C.1969); cf.

*Stacy v. Williams,* 306 F.Supp. 963 (N.D. Miss.1969). And in cases like the one before the court, vagueness in municipal regulations whose purpose is control of speech is fatal. *Kunz v. People of the State of New York,* 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951); see also, *Niemotko v. Maryland,* 340 U.S. 268, 71 S.Ct. 328, 95 L.Ed. 267 (1951) (Frankfurter, J., concurring).

 Although it is said in the second part that, with the stated exceptions, persons authorized by law to distribute literature or solicit contributions may do so in public areas of Chicago airports, the third part provides that no person shall distribute literature or solicit contributions unless between 9 and 9:30 a. m. each morning he or she registers with the airport manager or his authorized representative for the day of such activities. Upon registering, the airport manager or his authorized representative "shall allot reservations for each day in the sequence each person registers." That person is to give his or her name, the purpose of the activity, the organization represented, and the terminal in which he or she will be that day. A badge or insignia in a form prescribed by the airport manager is to be given the person; and it shall be worn by the bearer at the airport, in a manner visible to the public and be destroyed when the bearer leaves at the end of the day. These provisions do not define the qualifications for registration; they do not contain standards to guide the airport manager or his authorized representative in determining whether to allow the person to be registered; nor is there any provision by which the actions of the airport manager or his authorized representative can be reviewed either administratively or judicially. A reading of this and the previous part makes it obvious that the regulations create a mode of controlling the exercise of First Amendment rights in Chicago airports. For without the registration, a form of permit, solicitation of contributions, distribution of religious tracts, and sale of religious materials are unlawful conduct. And it appears that the registration requirements vest in the airport manager or his authorized representative discretionary power either to allow or to deny a person the opportunity to distribute literature or solicit contributions at a Chicago airport. A statute, ordinance, or regulation that makes it unlawful for a person to exercise First Amendment rights without obtaining, in advance, a permit from a municipal official who has unbridled discretionary power to prevent the exercise of First Amendment freedoms is invalid as prior restraint on rights guaranteed by the federal constitution. *Kunz v. People of the State of New York,* 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951); *Lovell v. City of Griffin, Ga.,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938). And it is a requirement of our constitutional law that the decisions of a municipal officer restricting First Amendment freedoms be the subject of prompt notice and a mode of review by which it can be determined whether the ruling is valid. See *Slate v. McFetridge,* 484 F.2d 1169 (7th Cir. 1973); *Collin v. Chicago Park District,* 460 F.2d 746 (7th Cir. 1972).

 The fourth part, in five alphabetically designated paragraphs, prohibits anyone, except a concessionaire and lessee as permitted by contract with the city of Chicago, from selling " * * * anything for commercial purposes." No one is to make any noise or create any disturbance which will interfere " * * * with the ability of others to hear public announcements or [interfere] with the transaction of business with airlines, concessionaires or lessees." No one is to interfere " * * * with the free passage to, or access of, other persons to corridors, entrances, doorways, or offices or airport facilities." An individual is not to be solicited by more than one person at a time. Finally, "[n]o person shall erect a table, chair, or other structure other than in the leased space." These words leave unclear whether the prohibition against sale of "anything for commercial purposes" includes religious tracts and religious materials or whether the sale of religious tracts and religious materials is exempt from the prohibition of sales of "anything for commercial purposes." Whether the prohibition against any "noise * * * [or] other

disturbance * * * " includes speech is left open to question. Also unclear is the prohibition against solicitation of any individual "by more than one person at a time." Whether this means the time the individual is within an airport or the time at which he is solicited is uncertain. Whether the prohibition against erection of a table, chair or other structure applies to lessees only is unclear. Why these prohibitions are necessary is not explained. This fact assumes importance in view of the principle that statutes, ordinances or regulations restricting exercise of First Amendment freedoms are inherently suspect and, when brought before court, bear a heavy presumption against their validity.

Finally, the fifth part gives the airport manager or his authorized representative the authority to declare " * * * an emergency on account of unusually congested conditions in the airport terminals caused by weather, schedule interruptions, extremely heavy traffic movements or other causes, or on account of emergency security measures. In such case an announcement shall be made." Upon such announcement, all persons distributing literature or soliciting contributions as permitted by the regulations through registration shall cease such activity. What is it that would make weather, or extremely heavy traffic, "or other causes" a factor for suppressing all First Amendment rights at a Chicago airport is not stated. What is meant by "other causes" is also left unclear. What is meant by "emergency security measures" is unsaid. These words, uncertain in meaning, and devoid of guiding standards, are capable of being construed as authority for prior restraint of First Amendment freedoms. For this reason, their application in express terms must be limited to the regulation of time, place and manner in which rights under the First Amendment are exercised. There must be narrow, objective and definite standards to guide those who exercise the authority to restrict protected constitutional rights. *Shuttlesworth v. Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). The standards must be susceptible to objective measurements; and there

must be precision in the terms of the regulations. See *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). As a rule, a statute or ordinance that vests unbridled discretionary power in a municipal officer to deny enjoyment of First Amendment freedoms is an extreme form of regulation and abridges the freedom of religion, of the press and of speech guaranteed by the First Amendment, a constitutional provision that is made applicable to the states by the Fourteenth Amendment. *Largent v. State of Texas,* 318 U.S. 418, 63 S.Ct. 667, 87 L.Ed. 873 (1943).

## IV

From all of the foregoing, the court concludes that the pleadings, affidavits, and memoranda show there is no genuine issue as to any material fact in this case; that the controversy between the parties can be resolved by a mere reading of the regulations adopted by the airport commissioner of the city of Chicago; therefore, this case is a proper one for summary judgment.

The regulations in question disclose that although they purport to balance the rights of the public at Chicago airports with those of persons who desire to enjoy First Amendment freedoms in the public areas of those facilities, they are in fact a municipal mode of regulating and controlling speech, one capable of administration that will suppress First Amendment rights. The words of the regulations are vague and uncertain; they give unbridled power to airport officials; their provisions are susceptible to a number of meanings. They are utterly lacking in standards that can guide airport officials in making decisions which may manifest the censor's heavy hand on the freedom of religion, of thought, speech and the press. They lack a procedure, or some means, administrative or judicial, by which these decisions can be reviewed to determine their validity. In sum, these regulations are facially unconstitutional. For these reasons, plaintiffs, as a matter of law,

are entitled to judgment granting them the declaratory and injunctive relief they pray for in their complaint. *Kuszynski v. City of Oakland,* 479 F.2d 1130 (9th Cir. 1973); *Gall v. Lawler,* 322 F.Supp. 1223 (E.D.Wis.1971); *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). Accordingly, an appropriate judgment order, consistent with this memorandum, may be tendered to the court for approval and entry.

So ordered.