G. D. SEARLE & CO., a corporation,
Plaintiff,

v.

INSTITUTIONAL DRUG DISTRIBU-
TORS, Inc., a California corpora-
tion, et al., Defendants.

INSTITUTIONAL DRUG DISTRIBU-
TORS, Inc., a California corporation,
Counterclaimant and Third-Party Plain-
tiff,

v.

G. D. SEARLE & CO., a corporation,
Counterdefendant,

(Stephen CHASE, Lewis S. Hoyt and
Julius K. Hornbein, Third-Party
Defendants.)

No. 19884.

United States District Court
S. D. California, Central Division.

716

Sidley, Austin, Burgess & Smith, Chicago, Ill., James E. S. Baker, Chicago, Ill., and McCutcheon, Black, Harnagel & Greene, by Philip K. Verleger, Los Angeles, Cal., for G. D. Searle & Co., plaintiff and counter-defendant.

Elwood S. Kendrick, Los Angeles, Cal., Jack Corinblit, Los Angeles, Cal., for Institutional Drug Distributors, Inc., defendant and third-party plaintiff.

Fred Weller, Los Angeles, Cal., McCutcheon, Black, Harnagel & Greene, Los Angeles, Cal., for Stephen Chase, Lewis S. Hoyt, third-party defendants.

Nicholas & Mack, by Augustus F. Mack, Jr., Los Angeles, Cal., for Julius K. Hornbein, third-party defendant.

YANKWICH, Chief Judge.

The action is for infringement of a trademark and seeks injunctive relief and damages. The defendants in their Answer have attacked the validity of the trademark and have also urged that injunctive relief be denied upon the ground that the plaintiff has been guilty of monopolistic practices and price-fixing in violation of the antitrust laws of the United States. 15 U.S.C.A. §§ 15, 26, 1115(b) (7).

The facts out of which the controversy arises are stated briefly in the Memorandum filed when preliminary injunction was issued. G. D. Searle & Co. v. Institutional Drug Distributors, Inc., D.C.Cal.1955, 141 F.Supp. 838.

A hearing on the merits confirms the conclusion arrived at previously on the basis of affidavits and depositions that the mark is valid and has been infringed by the defendants and that the plaintiff, to be referred to as Searle, has not been guilty of any practices in violation of antitrust laws which would call for denial of permanent injunctive relief.

I

The Mark Involved

As stated in the previous Memorandum, the plaintiff drug manufacturers registered on March 17, 1949, the mark "Dramamine" which was first used in commerce on January 28, 1949.

The mark referred to dimenhydrinate tablets used to combat motion sickness,

nausea and vomiting. A chemist produced by the defendants stressed the fact that the phrase "Dramamine" has a meaning in pharmacology when used in conjunction with the suffix hydro or others. In fact, the basic name of the drug to which the mark has been attached is 8-chlorotheophyllinate of diphenhydramine. Dimenhydrinate is the generic term of the product.

One of the latest medical dictionaries lists "Dramamine" as

"Trade-mark for dimenhydrinate, the 8-chlorotheophyllinate of diphenhydramine, useful in motion sickness." Blakiston's New Gould Medical Dictionary, 2d Ed., 1956, 368.

Another one lists it as;

"A proprietary brand of dimenhydrinate." Dorland's Illustrated Medical Dictionary, 23d Ed., 1957, 411.

"Hydro" is the Latin prefix for water and whenever it is used in conjunction with another chemical substance it denotes the presence of water in the chemical compound of a drug. From this the inference is sought to be drawn that because "dramine" is a suffix which has a meaning, "Dramamine" is not a valid mark because it is, as the defendant's chemical expert stated, "of the genus hydramine" (as defined in Hackh's Chemical Dictionary, 3d Ed., 1944, 416) and is merely descriptive of the chemical character of the product.

The difficulty with this reasoning is that "hydro" and "dramine" used either together or with other prefixes have a definite meaning. But when you take "dramine" and break it up into syllables and insert "ma" after the first one, you destroy the meaning of the word and create a word which is just as artificial and foreign to the genius of our language as the coined words Kodak (Elgin American Mfg. Co. v. Elizabeth Arden, 1936, 83 F.2d 681, 684, 23 C.C.P.A., Patents, 1153; Aunt Jemima Mills Co. v. Rigney & Co., 2 Cir., 1917, 247 F. 407, 410–411, L.R.A.1918C, 1039) or Oxolin (Ball Chemical Co. v. Hodenfield, D. C.Cal.1956, 137 F.Supp. 484). In short, "hydro" has a meaning. So has "hydramine". But "Dramamine" has none chemically or linguistically. So we have clearly a mark which is unrelated to the chemical composition of the product.

## II

### "Strong" Marks

The mark is not descriptive. By all standards it is a strong mark. Sunbeam Furniture Corp. v. Sunbeam Corporation, 9 Cir., 1951, 191 F.2d 141, 144. Marks of this character, especially when exploited on a national basis, have been given the highest protection by the courts both before and since the enactment of the Lanham Act. 15 U.S. C.A. §§ 1051, 1127. For they are the means of identifying a person's product.[1] They are what Judge Learned Hand, in a noted decision, called the user's "authentic seal", adding:

"by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control." Yale Electric Corp. v. Robertson, 2 Cir., 1928, 26 F.2d 972, 974.

In that case the registration of the use of the word "Yale" on flashlights was denied at the behest of a prior user who had used it on locks, keys and many kinds of hardware.

Other illustrations are: The words "Del Monte" although geographical, were denied use by an oleomargerine manufacturer at the behest of a prior user, a producer of food products under the registered trademark "Del Monte

[1] Indicative of the wide acceptance of the mark and its identification with the plaintiff's product is the fact that in one of the last scenes of the play "No Time For Sergeants", which had over a year's run in New York and is now presented under the auspices of the Theatre Guild by traveling companies throughout the country, one of the high-ranking officers asks, "Who has the Dramamine?"

718

Brands". Del Monte Special Food Co. v. California Packing Corp., 9 Cir., 1929, 34 F.2d 774. The trademark "V-8" as used on containers of vegetable juices was protected as a non-descriptive word, although it consisted merely of a combination of a capital letter and a numeral. Standard Brands v. Smidler, 2 Cir., 1945, 151 F.2d 34. The word "Stork" used to designate a famous New York Restaurant was protected against use by a bar in San Francisco. Stork Restaurant v. Sahati, 9 Cir., 1948, 166 F.2d 348. The use of the mark "Safe-Way" on toilet tissue and paper towels was denied at the behest of a company which did a national grocery and market business under the name of "Safeway". Safeway Stores v. Dunnell, 9 Cir., 1949, 172 F.2d 649. The use of the phrase "Radio Shack" was denied to one dealing in radio and electronic parts at the behest of a first user who had used a similar trademark. And this despite the fact that the first user *did not* manufacture the goods sold. Radio Shack Corp. v. Radio Shack, Inc., 7 Cir., 1950, 180 F.2d 200. And see, Julius R. Lunsford, Jr., Woe Unto You Trademark Owners, 1951, 49 Mich.Law.Rev. 1103.

■ And even marks which are "weak" because they contain ordinary descriptive words will be protected *if applied to a similar product.* Dixi-Cola Laboratories v. Coca-Cola Co., 4 Cir., 1941, 117 F.2d 352, 355–356; Philco Corp. v. F. & B. Mfg. Co., 7 Cir., 1948, 170 F.2d 958, 960–961; Sunbeam Furniture Corp. v. Sunbeam Corporation, 9 Cir., 1951, 191 F.2d 141; See, Lewis S. Garner, Narrow and Weak Trade-Marks, 1953, 22 George Washington Law Rev., p. 40.

In the case before us we have an instance of a strong, fanciful mark, used by a pharmaceutical manufacturing company doing business on a national scale and spending millions in advertising the product and others it manufactures and sells under tradenames and trademarks, being infringed by one of the persons, the defendant, used by them in limited transactions in a certain California locality.

By oral understanding, without any binding written agreement, the defendant was given the privilege of making bids to public institutions for sale of its products, at their catalogue prices. For this he received ten per cent of the price. After the relationship was terminated he proceeded to imitate the label of one of their most successful drug products. Admittedly the cause for the severance was that the defendant offered the drug to institutions at a lower than its catalogued price and allowed a larger discount for cash payments within a certain period. Which brings us to the question whether this method of bidding, to be described in more detail later, amounted to the type of horizontal price fixing which is condemned as a restraint of interstate commerce under the antitrust laws of the United States.

### III

#### The Nature of the Plaintiff's Activities

Before considering the question just posited, it is well to state the nature of the activities in which Searle engages. Its business is that of pharmaceutical manufacturer limited to medicinal drugs in the human field. This means that they do not engage in producing medicines that might be used in the treatment of animals. But in the conduct of their business rather than relying on copying other formulae, they devote special attention to the actual discovery of new medicinal products. No medicinal products are marketed unless, as the Vice-President of the Company in charge of distribution stated, they have satisfied themselves

> "at least and are in a position to document their claims that that product is an improvement over anything that has previously been available to the medical profession in that particular field of medicine."

For this reason, they are not what is described as a full-line pharmaceutical house, but restrict themselves to manufacture and sale of the relatively small

number of medicinal drugs which have been developed by them. More than 300 of their employees are engaged in research. A great majority of them have PhD degrees in biology or chemistry. Their laboratory facilities consist of two buildings at Skokie, Ill., the first one of which is one story in height and occupies a ground area in excess of an acre. The second building is three stories in height and also occupies a ground area in excess of an acre. Between them they house between 150 and 200 individual, fully-equipped laboratories. In order to facilitate research, there is maintained an animal colony and all the facilities that go with it.

The manufacturing of a pharmaceutical product takes many forms, the first one being the manufacture of the chemical substance. The second is the manufacture of the tablet. The same witness described the process in this manner:

"There actually are many forms of pharmaceuticals, but in the manufacture of a tablet, having satisfied everybody that is concerned that the chemical is pure, quite of the proper strength, then it is joined with other materials and is what is known as a granulation. Those materials are known as excipients and they are there purely for the purpose of making the tablet stand together rather than crumble too easily, or for the purpose of assuring that the tablet shall disintegrate in the body within the time in which it should, for the medicine to be effective. That then goes * * * to the compressing stage where it is compressed into the tablet. From that point on, it necessarily must be packaged and necessarily must be labeled and all of those things are very carefully controlled.

"The obvious purpose of the manufacturing part of the business is to assure that the product is properly manufactured, that it is of proper potency, that it is in a form which will remain stable and above all, that it is properly packaged and properly labeled, because in this business there is no room for mistakes. It would be a pretty serious matter if the wrong tablet got into the wrong bottle, and actually in our business, in the manufacturing end of our business, we have more people analyzing and controlling the product than we do otherwise, actually manufacturing as we consider it to be that important."

In the manner of distribution of drugs, hospitals have a unique position. For this reason, the packaging of drugs for hospitals is different from that which, through wholesalers, reaches the retail trade. The retailer has need for a package which is in line with his rate of sale and distribution. This calls for a relatively small package. As a prescription is written by a doctor, the patient may take the prescription to any of the drug stores in his locality. So the retail druggist never knows exactly what his volume will be and is therefore inclined to buy a smaller package. This, Searle allows him to do. In this manner, the drug will retain its potency even though it remains on the shelves for several months. Larger packages are provided for larger drug stores located in a medical building where the rate of prescription might be high. In a hospital in which the prescriptions are filled in the hospital pharmacy, it is possible to use large packaging because the hospital can anticipate the rate of use of a particular drug. So hospitals prefer larger packages and Searle supplies them.

There is in evidence a package of the drug involved which, when filled, contains 5,000 tablets,—a size that could not be used by the average retail store without a good deal of repackaging involving the danger of contamination of the drug. The package normally used for the wholesale trade for distribution through retail outlets consists of a glass bottle containing 100 tablets.

As a drug is of little value unless the medical profession knows of it, it is necessary that they be informed of the drug and of its nature in order that they

may prescribe it, and that the drug be easily procurable by the patients. So a pattern of distribution is adopted which was followed with the particular product involved. The witness referred to described what he called the normal pattern of distribution in this manner:

> "That is accomplished by essentially three means: First, by a large number of representatives who travel in this country constantly, whose responsibility it is to call upon the physicians and give them this information by word of mouth. Secondly, it is accomplished by announcements that go through the drug literature channels. The third is accomplished by paid advertising in the medical journals of the country."

The representatives who call chiefly on physicians, pharmacists, wholesalers and retailers, in regard to its products in order to keep them up-to-date on any new development that may come about, are called by Searle "medical representatives".

Searle prepares special manuals relating to its products, called "reference manuals" which inform the profession about the product and the experience with it in laboratories or clinically.

In the case of the drug to which the trademark "Dramamine" was adopted, its effect on motion sickness, nausea and vomiting was first noticed by a clinician at Johns Hopkins University, who had prescribed it for a woman patient who stated to him that in coming to the hospital on the street car she did not feel dizzy when she took the drug. Later experiments were carried on in 1948 by the United States Army on a transport. Two of the clinicians accompanied a rather ancient transport from the United States to Germany and gave the drug to the soldiers in order to observe its effect on motion sickness. These and other experiments ultimately resulted in the development of the Searle brand of dimenhydrinate to which the trade name "Dramamine" was attached by their laboratory men and, as already appears, later

registered and used in interstate commerce.

This rather lengthy description is necessary in order to understand that in this case we are not dealing with an ordinary company engaged in the wholesale distribution of drug products, many of which they do not manufacture, like McKesson & Robbins or others, but with a manufacturing concern engaged in the manufacture and improvement of either recognized drugs or drugs of their own invention applied to the cure of human illnesses. In considering the alleged violation of antitrust laws, these facts have a particular significance.

## IV

### No Antitrust Violation

The violation of antitrust laws is pleaded in the Answer under the general claim of "unclean hands" which is used in cases of this character to prevent enforcement in equity when misuse of a trademark is alleged. 87 C.J.S. Trade-marks, Trade-names, and Unfair Competition, § 102; Morton Salt Co. v. G. S. Suppiger Co., 1942, 314 U.S. 488, 494, 315 U.S. 788, 62 S.Ct. 402, 86 L.Ed. 363; Renaud Sales Co. v. Davis, 1 Cir., 1939, 104 F.2d 683; Strey v. Devine's, Inc., 7 Cir., 1954, 217 F.2d 187, 190. The Lanham Act specifically provides for denial of relief in trademark cases when a violation of the antitrust laws is shown to exist. 15 U.S.C.A. § 1115(b) (7). This provision was especially pleaded and evidence in the record was directed to prove violation of the Sherman Act. 15 U.S.C.A. § 1 and § 2.

■■ I am of the view that the defendant has not shown a violation of either section. On the contrary, the facts disclose that whatever understandings plaintiff entered into with the defendant and other persons through whom, at times, it acted, were permitted under § 16902 of the California Business & Professions Code. Consequently, they are excepted from the operation of antitrust laws both under the Miller-Tydings Act of 1937, 50 Stat. 693, 15 U.S.C.A. § 1

and the McGuire Act of 1952. 15 U.S.C. A. § 45.

As stated, Searle is a manufacturer of pharmaceutical products having a medical value in the human field. The product to which the mark under discussion is attached is one of them. Of the twenty-five products listed in one of their catalogues twenty-three are sold under coined trademarks or tradenames, the other two under their chemical names. The plaintiff *is not* a wholesaler or retailer.

The evidence shows that while the plaintiff had in 1949 some one hundred and fifty representatives and in 1957 some three hundred representatives throughout the country, ninety per cent of them call on physicians. They do not take orders from them nor do they sell them any products. They merely offer them samples. And the only way they know that their mission has been suc-cessful is when the physicians on whom they called prescribe the product, which is supplied through regular drug channels.

Prior to December, 1956, Searle adopted a system of selling to hospitals and public institutions which, in effect, functioned in this manner: In the Los Angeles area five wholesale druggists with whom they had "fair trade" agreements,[2] were given the right to make bids for Searle products to city or county hospitals or other institutions requiring bids. The products were shipped by Searle from Skokie, Ill., a suburb of Chicago, Ill., or San Francisco, Calif., direct to the institution. The bills bore the legend "sold to (name of drug company)", "shipped to (name of institution)" and the price. The drug companies were allowed ten per cent of the list price. The defendant was given the same privilege. They were not wholesalers.

2. The Fair Trade Agreement called "Manufacturer-Wholesaler Contract" contained these clauses:

"Whereas, the Manufacturer is the producer or the distributor of various commodities and the Wholesaler is engaged in the *sale* of such commodities at wholesale in various states which have enacted fair trade acts, and the Manufacturer and the Wholesaler desire to avail themselves of the provisions of such fair trade acts and of the fair trade acts of such other states as shall enact such statutes;

"Now, Therefore, in consideration of the premises, and the mutual benefits and obligations accruing to and assumed by the parties hereto from and by the *execution and delivery of this agreement,* the parties hereto agree as follows: \* \*

"2. The Wholesaler will not (except as specifically permitted by statute) directly or indirectly, advertise, offer for sale or sell any of the Products to any buyer in any state in which at the time of such sale a fair trade act shall be in effect at less than the minimum wholesale selling price at that time stipulated therefor in such state by the Manufacturer.

"3. The minimum wholesale selling prices stipulated by the Manufacturer for the Products in various states are those now or hereafter designated in Schedule A plus, in each sale, the amount of all sales and excise taxes applicable to such sale.

"The Manufacturer, at any time and from time to time by written notice given to the Wholesaler as hereinafter provided, may (a) eliminate one or more Products from Schedule A; (b) add one or more Products to Schedule A and stipulate minimum wholesale selling prices therefor; and/or (c) change the minimum wholesale selling price of any one or more of the Products.

"Each elimination from and each addition to Schedule A and each change in any minimum wholesale selling price, including each such change made pursuant to Article 4 of this agreement, shall be effective at the opening of business on the date specified in the notice thereof, and such notice (which may take the form of a *revised Schedule A which specifies its effective date*) shall be mailed so that, in the ordinary course of the mails, it will be received by the Wholesaler before the date so specified.

"4. In the event that, pursuant to any agreement similar to this one, the Manufacturer shall stipulate a minimum wholesale selling price for any of the Products in any given state which shall be different from the minimum wholesale *selling price at the time stipulated* for such products in such state under this agreement, the Manufacturer will give prompt written notice of such fact to the Wholesaler and such different minimum wholesale selling price shall be effective under this agreement as provided in Article 3 hereof."

They carried no stock of drugs. They merely were permitted to make bids for Searle products at the list price. No formal agreement existed between them and Searle as to these matters, except that it was understood that the bids were to be made at the prices stated in the catalogue and that the drug companies and the defendant, were to receive as a commission ten per cent of the invoice price. Searle charged no sales tax, it being collected by the drug companies or the defendant. Searle looked to the drug companies and the defendant for payment of the invoices. They in turn collected the full price from the institution, giving to Searle ninety per cent of it.[3]

There is no denial that the privilege was withdrawn when it was learned that the defendant had made bids below the amount set forth in the catalogue and had offered higher discounts. It is doubtful, to say the least, whether this arrangement, regardless of any fair trade practices constituted an agreement to fix prices of the type which the courts have condemned. See United States v. Colgate & Co., 1919, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992; Adams-Mitchell Co. v. Cambridge Distributing Co., 2 Cir., 1950, 189 F.2d 913; and see, Cutter Laboratories v. Lyophile-Cryochem Corp., 9 Cir., 1949, 179 F.2d 80, 93.

Certain it is that Searle *was not* in competition with the drug companies and the defendant, nor they with it. While, at times, they sold direct to institutions, they did not do so during the period when this special arrangement called "drop shipments" obtained.

I do not think that the sale to institutions of products under their own brands put them in the class of competitors of the drug companies and the defendant so as to subject them to the charge of horizontal price fixing. Dr. Miles Medical Co. v. John D. Park & Sons Co., 1911, 220 U.S. 373, 408, 31 S.Ct. 376, 55 L.Ed. 502; United States v. Masonite Corp., 1942, 316 U.S. 265, 274–275, 62 S.Ct. 1070, 86 L.Ed. 1461; United States v. Bausch & Lomb Optical Co., 1944, 321 U.S. 707, 720, 65 S.Ct. 805, 88 L.Ed. 1024; United States v. Frankfort Distilleries, Inc., 1945, 324 U.S. 293, 295–298, 65 S.Ct. 661, 89 L.Ed. 951; Schwegmann Bros. v. Calvert Distillers Corp., 1951, 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035; United States v. McKesson & Robbins, 1956, 351 U.S. 305, 311–313, 76 S.Ct. 937, 100 L.Ed. 1209.

In reality, the arrangement was one whereby the drug companies and the defendant, in a limited area, because the agents or representatives or "brokers" of the plaintiff in placing the products which they manufactured in institutions in exchange for the commission. The fact that the invoices spoke of the goods as "sold" to the druggist and to the defendants and that the plaintiff looked to them to collect the money does not, in my view, alter the situation. See Woodworkers Tool Works v. Byrne, 9 Cir., 1951, 191 F.2d 667; Woodworkers Tool Works v. Byrne, 9 Cir., 1953, 202 F.2d 530. The test applied in the tort case just cited is even truer in a case like this when realities must govern in determining the meaning of relationship. United States v. Richfield Oil Corp., D.C. Cal., 1951, 99 F.Supp. 280, 293. And see, Federal Trade Commission v. Curtis Publishing Co., 1923, 260 U.S. 568, 43 S.Ct. 210, 67 L.Ed. 408; United States v. General Electric Co., 1936, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362.

3. The general form of agreement entitled "Manufacturer-Wholesaler Agreement" and entered into between Searle and the wholesale druggists in the Los Angeles area contained this clause relating to drop shipments:

"7. We will allow you a handling discount of 10% (based upon our quotation) on drop shipments of Searle Tablets in Bulk Packages Only to any accredited hospital, physician or established clinic which orders such shipments through you. In the case of institutions which are city, county or state controlled, this handling discount arrangement extends to drop shipments of Any Searle Item or Package Size. Under no circumstances will we allow a handling discount on Federal Government business."

We are inescapably led to the conclusion that Searle's arrangements as to bids to public institutions and hospitals who received the products in quantities not available to wholesalers or retailers were outside the purview of the antitrust laws whether we consider them in the light of the state fair trade laws or not.

To amplify: Plaintiff's Hospital Catalog states:

"Sales of tablets in bulk quantities are restricted to physicians and hospitals."

We are, therefore, dealing with a commodity which was packaged for only the hospital trade and which was available only directly from Searle. As stated, there were two ways of supplying this commodity to the hospitals. One was by direct sales from Searle to the hospital, the other was by the "drop shipment". These were not competing but supplementary methods. "Drop shipment" was used where a hospital did not wish to deal direct with Searle, but required a local source. Where the hospital dealt direct, there was a direct account, and no bidding. There were, in effect, two markets and two parallel sets of accounts. The plaintiff's Vice-President in charge of distribution, Franklin P. O'Brien, testified:

"The Court: Did you at times submit a bid direct or did you always do it through a wholesaler?

"The Witness: No, in the case where a hospital had a direct account with us, then they did not ask for bids. But in cases where a hospital asked for bids, we allowed anybody who wished to bid and we ourselves did not bid."

Other testimony indicates that Searle would not ship on a "drop shipment" order to a hospital where they had a direct account. There was also the testimony of Mr. Butler, the mainstay of the defendant, that as to Searle's products, his concern bid only at Los Angeles County, Los Angeles City and San Bernardino County hospitals, so far as he could recall. He actually sold Searle goods to one account only, the County of Los Angeles. While the arrangement with the defendant continued Searle neither bid nor sold to these accounts.

These and other facts, already alluded to, indicate the absence of competition between Searle and the defendant or others. Essentially, Searle was a manufacturer and such sales were merely incidental and accessory to its main business,—that of manufacturing. See General Electric Company v. Kimball Jewelers, Inc., 1956, 333 Mass. 665, 132, N.E.2d 652, 657.

One other matter should be adverted to. The evidence shows clearly that both, as to the pharmaceutical product to which the mark was attached, and as to other products which Searle manufactured and sold under various tradenames, there were other products manufactured by other pharmaceutical companies *in actual competition with each of them.* So we are back to the fact that Searle did not exercise unreasonable monopoly powers, that they were not in a position to "control prices or exclude competition". United States v. E. I. DuPont De Nemours & Co., 1956, 351 U.S. 377, 391, 76, S.Ct. 994, 1005, 100 L.Ed. 1264.

Very apposite here are the following words of the Supreme Court in the case just cited:

"Thus one can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product. However, this power that, let us say, automobile or soft-drink manufacturers have over their trademarked products is not the power that makes an illegal monopoly. *Illegal power must be appraised in terms of the competitive market for the product.*

"Determination of the competitive market for commodities depends on how different from one another are the offered commodities in character or use, how far buyers will go to

substitute one commodity for another. For example, one can think of building materials as in commodity competition but one could hardly say that brick competed with steel or wood or cement or stone in the meaning of Sherman Act litigation; the products are too different. This is the interindustry competition emphasized by some economists. See Lilienthal, Big Business, c. 5. On the other hand, there are certain differences in the formulae for soft drinks but one can hardly say that each one is an illegal monopoly. Whatever the market may be, we hold that control of price or competition establishes the existence of monopoly power under § 2. Section 2 requires the application of a reasonable approach in determining the existence of monopoly power just as surely as did § 1." 351 U.S. at page 393, 76 S.Ct. at page 1006. (Emphasis added.)

So here the only monopoly is that which the excellence of its products may have given to Searle. Indicative of the freedom of action in the field is the fact that the defendant, after being deprived of the privilege of bidding for Searle products, caused a chemist to manufacture a kilo of the chemical product (dimenhydrinate) and attempted to sell it under the trademark name of "Dramamine". They did not go beyond that because, as stated, the injunction intervened and stopped in their incipiency their activities in infringing the mark. Only one advertisement appeared in which the mark "Dramamine" was used, dividing the syllables in this manner: "Dram-A-Mine", and adding the letters "I.D. D.", the initials of the defendant's corporate name.

### Summary and Conclusion

■■ From what precedes the following conclusions may be drawn. The plaintiff has a valid mark which has been infringed by the defendant. The fact that the harm which the defendant might do to a concern such as the plaintiff

with its large resources is not great, affects only the right to recover damages and makes the case one in which the remedy should be limited to injunctive relief. 15 U.S.C.A. § 1117; Champion Spark Plug Co. v. Sanders, 1947, 331 U.S. 125, 130–131, 67 S.Ct. 1136, 91 L.Ed. 1386; National Dryer Mfg. Corp. v. National Machinery Co., D.C.Pa.1955, 136 F.Supp. 886. Otherwise the plaintiff is entitled to the full relief as spelled out by the court in Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 1942, 316 U.S. 203, 205, 62 S.Ct. 1022, 86 L.Ed. 1381:

"The protection of trade-marks is the law's recognition of the psychological function of symbols. If it is true that we live by symbols, it is no less true that we purchase goods by them. A trade-mark is a merchandising short-cut which induces a purchaser to select what he wants, or what he has been led to believe he wants. The owner of a mark exploits this human propensity by making every effort to impregnate the atmosphere of the market with the drawing power of a congenial symbol. Whatever the means employed, the aim is the same—to convey through the mark, in the minds of potential customers, the desirability of the commodity upon which it appears. Once this is attained, the trade-mark owner has something of value. If another poaches upon the commercial magnetism of the symbol he has created, the owner can obtain legal redress." 316 U.S. at page 205, 62 S.Ct. at page 1024.

■■ As already stated, the plaintiff has not been guilty of violation of any of the antitrust laws. The arrangements as to price are within the scope of the restrictions that a manufacturing company may place on sale on penalty of refusing to deal with a particular person. Not every monopolistic practice violates the antitrust law. Monopolistic restrictions are condemned only if they affect a substantial segment of interstate commerce. Unilateral refusal to deal is not

a violation of law. Charles F. Barber, Refusal to Deal Under the Antitrust Laws, 1954, 103 U. of Pa.L.Rev. 847. This is especially true where, as here, there was competition in the market as to every one of the products manufactured by the plaintiff including the trademarked drug involved in this litigation. United States v. E. I. DuPont De Nemours & Co., 1956, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264. See Donald F. Turner, Antitrust Policy and the Cellophane Case, 1956, 70 Harv.L.Rev. 281.

The only real advantages the plaintiff has are those flowing from the primacy which its trademarked and tradenamed products and their quality have given them over the course of years. To this they are legitimately entitled. There can be no unlawful monopolization

> "unless accompanied by a purpose or intent to exclude competition." Cutter Laboratories v. Lyophile-Cryochem Corp., 9 Cir., 1949, 179 F.2d 80, 93.

Here, the field was left open to those with whom Searle dealt to sell products competitive to those manufactured by Searle. There was no requirement of "exclusive representation" of the type which the antitrust laws condemn *as a condition to dealing in Searle products* or even "Dramamine". See Standard Oil Co. of California and Standard Stations v. United States, 1949, 337 U.S. 293, 69 S. Ct. 1051, 93 L.Ed. 1371; Richfield Oil Corp. v. United States, 1952, 343 U.S. 922, 72 S.Ct. 665, 96 L.Ed. 1344.

So Judgment will be for the plaintiff for injunctive relief and costs.

■ On observation should be added as to the form of the Judgment. The defendant by counterclaim seeks damages for violation of the antitrust laws (15 U.S.C.A. § 15 and §. 26), and has asked for a jury trial. The scope of the trial of the counterclaim will be markedly affected by the correctness of the findings of this Court on the subject of the validity of the trademark and of the lawfulness of the practices outlined in this opinion. So this is a case in which the provisions of Rule 54(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. should apply. The Judgment will, therefore, be declared *final* as to the issues involved within the meaning of that rule. Formal judgment and findings to be prepared by counsel for the plaintiff under local Rule 7.