PHI DELTA THETA FRATERNITY
et al., Plaintiffs,

v.

J. A. BUCHROEDER & COMPANY,
Defendant.

SIGMA CHI CORPORATION et al.,
Plaintiffs,

v.

J. A. BUCHROEDER & COMPANY,
Defendant.

J. A. BUCHROEDER & COMPANY,
Plaintiff,

v.

L. G. BALFOUR COMPANY et al.,
Defendants.

COLUMBUS STATIONERY COMPANY,
Plaintiff,

v.

L. G. BALFOUR COMPANY et al.,
Defendants.

James A. MURRAY and Edith B. Murray, partners, d/b/a Nassau China Company, Plaintiffs,

v.

L. G. BALFOUR COMPANY et al.,
Defendants.

Edward F. MILLER, Plaintiff,

v.

L. G. BALFOUR COMPANY et al.,
Defendants.

H. F. MICHAELIS, Plaintiff,

v.

L. G. BALFOUR COMPANY et al.,
Defendants.

William G. UNDERWOOD, d/b/a Underwood's College Jewelers, Plaintiff,

v.

L. G. BALFOUR COMPANY et al.,
Defendants.

James L. LESTER, Jr., Plaintiff,

v.

L. G. BALFOUR COMPANY et al.,
Defendants.

H. E. PENNINGTON, d/b/a Western Collegiate Supply Company, Plaintiff,

v.

L. G. BALFOUR COMPANY et al.,
Defendants.

H. O. FARRIS, d/b/a Farris Jewelers, Plaintiff,

v.

L. G. BALFOUR COMPANY et al.,
Defendants.

Nos. 683, 684, 729, 736, 737, 751–755, 792.

United States District Court
W. D. Missouri,
Central Division.

March 10, 1966.

Nos. 683 and 684:

George A. Spencer, Columbia, Mo., Burns, Doane, Benedict & Irons, Meredith M. Daubin, Washington, D. C., Kingsland, Rogers, Ezell & Robbins, St. Louis, Mo., Joseph B. Kennedy, Jr., Washington, D. C., Watson, Ess, Marshall & Enggas, Kansas City, Mo., for plaintiffs.

Nick C. Spanos, Los Angeles, Cal., Popham, Thompson, Popham, Trusty & Conway, Kansas City, Mo., for defendant.

Nos. 729, 736, 737, 751–755, 792:

Nick C. Spanos, Los Angeles, Cal., Popham, Thompson, Popham, Trusty & Conway, Kansas City, Mo., for plaintiffs.

Brewer, Myers & Branton, Kansas City, Mo., Joseph B. Kennedy, Jr., Washington, D. C., Watson, Ess, Marshall & Enggas, Kansas City, Mo., for defendants.

JOHN W. OLIVER, District Judge.

### Introductory

In accordance with Rules 16, 42(b) and 56 of the Federal Rules of Civil Procedure and after extensive pretrial proceedings the parties agreed for the purpose of obtaining a definitive ruling on certain questions of law presented by certain motions for summary judgment and to dismiss filed before the recent reassignment of these cases that such questions be presented under a factual stipulation entered solely for that purpose.

Two of the actions, Nos. 683 and 684, have been referred to as the "Trademark Cases." The other actions, Nos. 729, 736, 737, 751, 752, 753, 754, 755, and 792, have been referred to as the "Antitrust Cases." All of the cases are very closely related and the controlling legal questions presented in each are identical in substance, namely, whether (a) an assumed violation of the antitrust laws of the United States is a defense in an action for trademark infringement; and (b) whether defendants in the Trademark Cases, by way of counterclaim, and plaintiffs in the Antitrust Cases have, under the facts as stipulated for purposes of the agreed procedure, actions for violations of the antitrust laws of the United States. As we shall state, both questions will be answered in the affirmative.

The counterclaims in the Trademark Cases and the complaints in the Antitrust Cases are stated in two counts and are based on Sections 4 and 16 of the Clayton Act (Sections 15 and 26 of Title 15, United States Code) for alleged violations of Sections 1 and 2 of the Sherman Act (Sections 1 and 2, Title 15, United States Code).

For convenience, we shall follow the briefs of the parties by referring to the defendants and counterclaimants in the Trademark Cases and the plaintiffs in the Antitrust Cases as the "plaintiffs" and by referring to the opposing parties as the "defendants."

Defendants advise us that the two Trademark Cases "were filed to test the rights of all national college fraternities and sororities to control the manufacture, sale, and distribution of products bearing their distinctive insignia" (page 7 of Dfts. Br.). It is apparent that the counterclaims filed in those two trademark cases and the filing of the nine additional antitrust actions against defendants have expanded the intended scope of this litigation considerably.

### Nature of Antitrust Violations Alleged

The following statement from plaintiffs' brief accurately outlines the nature of the antitrust violations charged in the counterclaims and complaints:

The conspiracy charged in the complaints and counterclaims is briefly described as follows: Some-

time prior to 1920 Mr. L. G. Balfour and his companies (hereinafter referred to as the "Balfour Conspirators") conceived a scheme whereby the device of the "Sole Official Jeweler Contract" could be used as a means of securing to Balfour Conspirators a monopoly of the insignia goods business of all of the college fraternities and sororities in the United States. This scheme contemplated that the Balfour Conspirators would secure Sole Official Jeweler Contracts from all of the college fraternities (and sororities) with the intended result that the Balfour Conspirators should be the only manufacturers, distributors, and vendors in the United States of items bearing fraternity insignias, trademarks, and crests.

All of the college fraternities and sororities (each and all of whom are hereinafter referred to as the "Fraternity Conspirators") beginning sometime in the early 1920's, or prior thereto, became aware of and privy to this scheme, and they participated in it first by granting Sole Official Jeweler Contracts to the Balfour Conspirators and further by setting up machinery under their charters, constitutions, and by-laws whereby each of the Fraternity Conspirators were enabled to protect the exclusive rights given the Balfour Conspirators under the Sole Official Jeweler Contracts by means of disciplinary action against any of their members who dealt in any way with any jeweler other than the particular Balfour Conspirator which was the particular fraternity's Sole Official Jeweler.

Such machinery which provided for enforcement within the ranks of the Fraternity Conspirators themselves was obviously ineffective to completely protect the Balfour Conspirators against competition from Independent jewelry manufacturers and vendors who were either not subject to or who were indifferent to fraternity discipline. And so in or about 1926, and thereafter, the Fraternity Conspirators (assisted and abetted by the Balfour Conspirators) began to register their "trademarks" (which had previously been unregistered) thus providing for the first time a means whereby—under color of legal right—the exclusive privileges which pursuant to their conspiracy each and all of the Fraternity Conspirators had given and were giving to the Balfour Conspirators could be protected against competition from Independent jewelers who could not otherwise effectively be pressured to stop competing with the Balfour Conspirators in the insignia goods business.

In other words, what is charged here is not an isolated conspiracy by a single fraternity trademark owner with its licensee, but a conspiracy encompassing practically all of the leading college fraternities and sororities in the United States who with knowledge of what the others were doing granted the Balfour Conspirators exclusive rights to manufacture and sell items bearing their fraternity crests and emblems, and who prevented and restricted competition from Independent jewelers by the use of fraternity enforcement machinery and by the abuse of the rights they secured when they registered their "trademarks" under the Lanham Act.

### Stipulation of the Parties

The parties stipulated that the following ultimate question was for present decision:

Whether in the Antitrust Cases the plaintiff's case would survive a motion to dismiss after their opening statement, or a motion for a directed verdict at the close of the case in chief, by defendants, if the facts stipulated herein constitute the only evidence that there was a conspiracy which violated the antitrust laws.

The stipulation also included four questions that defendants believed were presented. Those four questions were:

I. Whether the use of the marks involved in these cases, as shown by the facts herein stipulated, constitutes a violation of the antitrust laws and, if so, is it an affirmative defense to the suits for trademark infringement.

II. Whether the use of the marks involved in these cases, as shown by the facts herein stipulated, constitutes a violation of the antitrust laws and, if so, is it a basis for a suit for treble damages under Section 4 of the Clayton Act.

III. Whether Section 33(b) (7), of the Lanham Act, 15 U.S.C. 1115(b) (7), provides an absolute defense to a suit for trademark infringement.

IV. Whether a finding by the court that an otherwise valid mark has been used in furtherance of a conspiracy to violate the antitrust laws requires the court to decree cancellation of the mark.

The stipulation further stated eight questions that plaintiffs believed were presented. Those questions were:

I. Does the non-commercial character of the fraternities and sororities render them immune to the effect of 15 U.S.C.A. 1115(b) (7)?

II. Is there any other basis for the non-applicability of 15 U.S.C.A. 1115(b) (7) other than the non-commercial character of the fraternities and sororities?

III. If 15 U.S.C.A. 1115(b) (7) applies, is it a defense to the maintenance of infringement actions by the fraternities and sororities against the plaintiffs in the anti-trust cases and the counter-claimant in Nos. 683 and 684?

IV. If 15 U.S.C.A. 1115(b) (7) applies, does it bar the defense of trademark in the two counterclaims and in the antitrust cases filed?

V. Does the non-commercial character of the fraternities and sororities render them immune from antitrust liability they would each otherwise have to the plaintiffs in in the Antitrust Cases and the counterclaimant in Nos. 683 and 684?

VI. Does the non-commercial character of the fraternities and sororities render L. G. Balfour, the L. G. Balfour Company and Burr, Patterson & Auld Company immune from antitrust liability which such person and corporations would otherwise have to the plaintiffs in the Antitrust Cases and the counterclaimant in Nos. 683 and 684?

VII. Does the ownership by L. G. Balfour of all of the outstanding stock of the L. G. Balfour Company and all of the outstanding stock of Burr, Patterson & Auld Company preclude any finding of an unlawful conspiracy during the period of such stock ownership if the parties found to be conspiring consisted only of any two or more of L. G. Balfour, L. G. Balfour Company and Burr, Patterson & Auld Company?

VIII. Does the ownership by L. G. Balfour of all of the outstanding stock of the L. G. Balfour Company and the ownership by L. G. Balfour Company of all of the outstanding stock of Burr, Pat-

terson & Auld Company preclude any finding of an unlawful conspiracy during the period of such stock ownership if the parties found to be conspiring consisted only of any two or more of L. G. Balfour, L. G. Balfour Company and Burr, Patterson & Auld Company?

The stipulation then provided that:

All parties hereto agree that this stipulation is made solely for the purpose of enabling the court to rule upon the questions of law presented in this stipulation, it being otherwise impossible to perfect the record so as to permit rulings upon pending motions for summary judgment and to dismiss, * * *. Accordingly, for the sole purpose of deciding the foregoing questions of law and for no other, the following facts shall be deemed to be proven or capable of being proved:

1. Each of the fraternities and sororities which are named as defendants in the Complaints in the Antitrust Cases was at all times herein material a non-commercial organization.

2. Each of the fraternities and sororities which are named as defendants in the Complaints in the Antitrust Cases at all times herein material was the owner of valid, uncontestable trademarks which enable it to control the manufacture, distribution and sale of insignia goods bearing such marks.

3. Each of the fraternities and sororities which are named as defendants in the Complaints in the Antitrust Cases have granted an exclusive license to L. G. Balfour Company or Burr, Patterson & Auld Company to manufacture, distribute and sell certain insignia goods bearing such registered marks.

4. Each and all of the fraternities and sororities which are named as defendants in the Complaints in the Antitrust Cases conspired with L. G. Balfour Company and Burr, Patterson & Auld Company (both of which are commercial enterprises organized for profit) and also with L. G. Balfour individually, as alleged in the Complaint filed in Civil Action No. 792, to violate the antitrust laws, by granting a monopoly of the manufacture, distribution and sale of insignia goods bearing said registered marks to said L. G. Balfour, L. G. Balfour Company and Burr, Patterson & Auld Company.

5. The insignia goods business as defined in the Complaints in the Antitrust Cases is an economically significant product market.

6. Each of the plaintiffs in the Antitrust Cases, and the counterplaintiff in the Trademark Cases, was substantially damaged in its business and property by reason of such conspiracy, and can prove the amount thereof by competent evidence.

7. The L. G. Balfour Company was wholly-owned during all times material to said cases by L. G. Balfour. All of the outstanding stock of Burr, Patterson & Auld Company has since at least June 30, 1934, been owned by L. G. Balfour Company or L. G. Balfour, individually.

All parties heretofore further stipulate and agree that all theories of liability presented or which might be presented in any of said cases are presented by this Stipulation and the Briefs to be filed in accordance with the provisions hereof.

For purposes of deciding the questions of law presented, all parties hereto further stipulate and agree that there are no disputed facts within the meaning of Rule 56 of the Federal Rules of Civil Procedure that will prevent a decision

on the questions of law presented in this Stipulation.

We again commend counsel for their cooperation in accomplishing the basic purpose announced at the pretrial conference, which was then stated in the following agreed language:

The basic purpose of the factual statements to be agreed to for purposes of the motion is to put the case in posture so that all essential elements of the alleged antitrust actions, including the element of damage, are admitted by the fraternities and by the Balfour Company, in order that a full and fair test of the validity and scope of the trademark defense as it applies both to the fraternities and to the Balfour Company may be tested and a definitive determination made, much in the same pattern that the Court ruled controlling questions of law in the Capehart litigation.[1] (pages 5–6 of transcript of September 24, 1965).

*Answers to Questions Presented*

For reasons that we shall state in some detail, we determine that the ultimate question jointly presented by the stipulation as to whether plaintiffs' antitrust case would survive defendants' procedural motions under the stipulated facts must be answered in the affirmative.

■■ We also determine that, under the facts as stipulated for purposes of this proceeding, a violation of the antitrust laws is established and that such violation is an affirmative defense to the suits for trademark infringement (Defendants' Question I); that such antitrust violation is, if ultimately proven, a basis for a suit for treble damages and injunctive relief (Defendants' Question II); that Section 33(b) (7) of the Lanham Act (Section 1115(b) (7), Title 15, United States Code) so provides (Defendants' Question III); and

that effective relief, dependent upon a full development of the factual situation at trial (compare White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963)), may require a decree cancelling the registration of the particular marks involved (Defendants' Question IV).

The answers to the questions presented by the plaintiff will be obvious from what we shall say; but, by way of convenient summation, we now determine that plaintiffs' Questions I, II, V, VI, VII and VIII should be answered in the negative, and plaintiffs' Questions III and IV in the affirmative.

*Rationale Upon Which Answers Are Based*

The point of beginning is the declaration of Congressional intent as contained in Sections 1 and 2 of the Sherman Act (Sections 1 and 2, Title 15, United States Code).

Section 1 provides that "[e]very contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: * * *".

Section 2 provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or the commerce among the several States, or with foreign nations, shall be deemed guilty of [an offense against the laws of the United States] ".

■ Our construction and application of the antitrust laws must be consistent with the declared Congressional purpose as stated in the statute and as construed by the Supreme Court. Basically, defendants contend that an assumed valid registration of a trademark and applicable principles of trademark law authorized the concerted action alleged in the counterclaims and complaints in a man-

1. The reference was to not dissimilar procedures followed in United States for Use and Benefit of Fine v. Travelers Indemnity Company, W.D.Mo.1963, 215 F.Supp. 455.

ner legally sufficient to render the general antitrust laws inapplicable to such conduct.

As recently as the last day of last month, the Supreme Court noted that "[w]e have long recognized that the antitrust laws represent a fundamental national economic policy" and that "we cannot lightly assume that the enactment of a special regulatory scheme for particular aspects of an industry was intended to render the more general provisions of the antitrust laws wholly inapplicable to that industry," Carnation Co. v. Pacific Westbound Conference, 86 S.Ct. 781, October Term, 1965, February 28, 1966.

■ In similar manner, we may not lightly assume that the enactment of laws under which trademarks could be registered or equitable principles applicable to trademarks generally were intended to render ineffective the execution of the national economic policy of the United States as long expressed in the antitrust laws; particularly, when the most recently enacted trademark law, the Lanham Act, in Section 33(b) (7) (Section 1115(b) (7), Title 15, United States Code) expressly provides that the violation of the antitrust laws shall be a defense to trademark infringement. It is with this general thought in mind that we approach the particulars of the facts stipulated for purposes of this proceeding.

### Assumed Non-Commercial Nature of Fraternities and Sororities

■ The stipulated fact that each of the fraternities and sororities are non-commercial organizations has no material bearing on this case. In a not dissimilar situation, the Supreme Court held in American Medical Ass'n. v. United States, 317 U.S. 519 at 528, 63 S.Ct. 326 at 328, 87 L.Ed. 434 (1943), that: "The calling or occupation of the individual physicians charged as defendants is immaterial if the purpose and effect of their conspiracy was * * * obstruction and restraint." That case also held that "the fact that [other] defendants

are physicians and medical organizations is of no significance for Sec. 3 prohibits 'any person' from imposing the proscribed restraints * * *." (317 U.S. at 529, 63 S.Ct. at 328).

### Assumed Ownership of Trademarks and Nature of Alleged Antitrust Violation

■ Nor does the fact that the fraternities and sororities are stipulated for present purposes to be the owners of valid, uncontestable trademarks, nor the stipulated fact that such fraternities and sororities have granted an exclusive license to L. G. Balfour Company or Burr, Patterson & Auld Company to manufacture, distribute and sell insignia goods bearing those registered marks have any controlling impact upon this case.

United States v. Bausch & Lomb Optical Co., 321 U.S. 707 at 724, 64 S.Ct. 805, 88 L.Ed. 1024 (1944), teaches that licensees of trademarked articles may run afoul of the antitrust laws of the United States if an otherwise legal arrangement is but "a patch and a part" of action proscribed by those laws. That case further held that where such a factual situation is found to exist, "[e]quity has power to eradicate the evils of a condemned scheme by prohibition of the use of admittedly valid parts of an invalid whole" (321 U.S. at 724, 64 S.Ct. at 814).

United States v. General Electric Company, D.C.N.J.1949, 82 F.Supp. 753, at page 849, in a similar manner, pointed out that "[u]nder ordinary circumstances there would be no vice in General Electric licensing the use of the 'Mazda' symbol * * * or in denying a license to anyone." Judge Forman, however, determined as a fact that "the use made by General Electric of the mark 'Mazda' within the area of anti-trust laws" brought different legal implications into play.

In that case it was factually determined that only "Westinghouse was licensed [by General Electric] to employ the 'Mazda' trademark and no other manufac-

turer was licensed to employ the 'Mazda' symbol." The conduct of General Electric and its sole "Mazda" licensee was held, under the facts there involved and under the applicable law, to have established "a pattern of conduct designed to restrict competition" in violation of Section 1 of the Sherman Act. See also United States v. General Electric, D.C. N.J.1953, 115 F.Supp. 835, particularly at 858, in which General Electric was enjoined from making use of the trademark "Mazda."

Bartholomew A. Diggins, a special assistant to the Attorney General, who was one of the government attorneys in the first Mazda case, published an article in the Georgetown Law Journal entitled "Trade Marks and Restraint of Trade," 32 Georgetown Law Journal, 113 (January, 1944). It was there suggested that "the significance and effectiveness of trade-marks in regulating and restricting competition can hardly be over-emphasized." Diggins added that "together with patents, trade-marks are included among the chief legal sanctions under which cartels have established, maintained, and enforced restraints of trade."

In his closing paragraph Mr. Diggins called attention to the early determination of the Supreme Court in Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20 at 49, 33 S.Ct. 9, 57 L.Ed. 107 (1912), where it had been held that rights conferred by patents do not confer "a universal license against positive prohibitions" and that "[t]he Sherman law is a limitation of rights,—rights which may be pushed to evil consequences, and therefore restrained."[2]

Mr. Diggins forecast that trademarks would eventually be subjected to the same test as patents and "subjected to this test, trademarks will undoubtedly be found ineffective, within the United States, to circumvent the public policy which condemns monopolies and restraint of trade."

Judge Rifkind applied exactly that theory as the trial judge in Bosch & Lomb by holding that "[t]he trade mark does not give Soft-lite any * * * power to project its control over the trade marked article." Judge Rifkind reasoned that "[t]his has been held with respect to a patent," and that "[a] fortiori it applies to a trademark," United States v. Bausch & Lomb Optical Co., S.D.N.Y. 1942, 45 F.Supp. 387 at 396.

*Neither Registration of the Trademarks Nor Principles of Trademark Law Render Antitrust Laws Inapplicable to Stipulated Facts*

■ We do not know who had the original idea that trademarks should be registered with the Patent Office. We do know that the origin and nature of trademarks and that of patents are in many respects totally dissimilar and that assumptions to the contrary are unfounded. Equity courts, long before statutes permitted registration, evolved principles for the protection of trademarks. Indeed, trademark law is but one facet of the law of unfair competition.

■ Congressional power to authorize registration of trademarks, of course, is disassociated from the constitutional grant relating to patents and copyrights. In In re Trade-Mark Cases, 100 U.S. 82 at 93 and 94, 25 L.Ed. 550 (1879), the Supreme Court held that "any attempt * * * to identify the essential characteristics of a trade-mark with inventions and discoveries in the arts and sciences, or with the writings of authors, will show that the effort is surrounded with insurmountable difficulties." And, in United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90 at 97, 39 S.Ct. 48 at 50,

2. Mr. Justice Brandeis, in Carbice Corp. of America v. American Patents Development Corp., 283 U.S. 27 at 35, 51 S.Ct. 334 at 336, 75 L.Ed. 819 Footnote 5 (1931), after noting Standard Sanitary Mfg. Co., commented, by way of analogy, that "[r]estrictions on the manner of use, essential to prevent unwarranted extension, are inherent in other limited monopolies" and included both trademarks and tradenames as examples of limited monopolies other than patents. See also Chief Justice Stone's not dissimilar comment in Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, at 494, 62 S.Ct. 402, 86 L.Ed. 363 (1942).

63 L.Ed. 141 (1918), it was held that one committed "fundamental error [if he supposed] that a trade-mark right is a right in gross or at large, like a statutory copyright or a patent for an invention, to either of which, in truth, it has little or no analogy."

Doctrines of misuse of both patents and trademarks, however, and efforts to extend the use of either beyond the limitations of their different protected areas have experienced a somewhat parallel development; although doctrines relating to misuse of patents, until relatively recently, developed more rapidly than similar doctrines relating to misuse of trademarks.

While specific protection long has been given the legal interests embodied in both patents and trademarks, efforts to exceed the carefully limited rights of either have consistently been rejected.

 So far as trademarks are concerned, and we are here concerned solely with trademarks, the limitations imposed upon misuse of a trademark were justified by an application of the ancient equity maxim that he who comes into equity must come with clean hands. For a collection of cases refusing equitable relief because of misuse of trademark see Worden & Co. v. California Fig Syrup Co., 187 U.S. 516, 23 S.Ct. 161, 47 L.Ed. 282 (1903).[3] And see Manhattan Medicine Co. v. Wood, 108 U.S. 218 at 225, 2 S.Ct. 436 at 441, 27 L.Ed. 706 (1883), where Mr. Justice Field held that equity's refusal to permit an abuse of a trademark "is but an application of the common maxim that he who seeks equity must present himself in court with clean hands."

It is quite doubtful whether the clean hands doctrine is quite as ancient as might be supposed. Sir William Grant in Cadman v. Horner, 18 Ves. 10, 11 (1810), made his use of the clean hands maxim in 1810 sound as though it had been around and in use a long time. The first reported use of the expression, however, was but twenty-odd years earlier by Eyre, C.B. in Dering v. Earl of Winchilsea, 1 Cox Eq. 318, 319 (1787).[4]

With breathtaking frankness, Chancellor Eyre confessed in the latter case that "it is not laying down any principle to say that his [a plaintiff's] ill conduct disables him from having any relief in this court." Of course, historical hindsight teaches us that equity was then struggling for a set of principles to apply and that the use of maxims was a part of that evolutionary development.

The principle that eventually developed was that misuse and illegal use of a trademark in any form would be grounds for denial of the limited protection that equity would otherwise afford to the trademark owner. That principle is still expressed in "clean hands" language because that phrase, properly understood, is juridical shorthand for a not uncomplicated idea.

*Lanham Act Accepted Principle That Use of a Trademark As a Part of an Antitrust Violation Established Infringment Defense*

Indeed, the "clean hands" shorthand found expression in the legislative history of the Lanham Act. That history shows that, as originally proposed, the Department of Justice strongly opposed the enactment of the bill. See Hearings for Subcommittee of the Committee on Patents, United States Senate 78th Cong. 2d Sess. on H.R. 82, November 15 and 16, 1944, pp. 58–71, Report of the Department of Justice.

Toulmin, in Section 27.34 of 4 Toulmin's Anti-Trust Laws, page 795, sum-

---

3. At page 531 of 187 U.S., at page 165 of 23 S.Ct. the quotation from Fetridge v. Wells, 13 How.Pr. 385, stated the clean hands doctrine in terms of purity rather than cleanliness—"Those who come into a court of equity, seeking equity, must come with *pure* hands *and a pure conscience*." The additions of a purity of *conscience* tends to support Pound's suggestion that concepts of morality are indeed related to equity's ancient clean hands maxim. See § 96 of Pound's Jurisprudence, Vol. III, at pages 303–304.

4. I am again indebted to Pound for the cases cited. See Pound's Jurisprudence, Vol. III, pages 547–548.

marized the appendix attached to that Report of the Department of Justice as follows:

The Department of Justice attached to its report an appendix titled "Trade-Marks as Instruments of Monopoly and Restraint of Trade," in which it was said that trade-marks have been used in recent years as a convenient vehicle for:

1. Geographical Division of Fields.
2. Division of Fields According to Classes of Customers.
3. Discrimination Between Different Channels of Distribution Resulting in Destruction of Independent Enterprise.
4. Maintenance of Goodwill of Enemy-Owned Companies.
5. Monopolistic Control Through Use of Trade-Marks.

The opposition of the Department of Justice was also reflected when it stated in its Report that:

The privileges conferred upon copyright and patent are rewards for contributions to knowledge and technology which ultimately become a part of the public domain available to all. The privileges conferred on the inventor and author are limited in time, in scope, and in restrictive practices which may be adopted in commercial exploitation. Sanctions for these privileges are found in the Constitution. Trade-marks have no such sanction. In our economic system, dependent on free competition for its growth and expansion, it would be anomalous to accord to the trade-mark privileges not enjoyed by higher forms of creative effort. (4 Toulmin's Anti-Trust Laws, footnote 53, pp. 794–795).

The bill then proposed, of course, was subjected to two important amendments, one of which is directly applicable to this case. What became present Section 33(b) (7) (Section 1115(b) (7), Title 15, United States Code), was added by amendment. And, by proviso, in what is now Section 14 of the Lanham Act, (Section 1064, Title 15, United States Code), the Federal Trade Commission was given power to apply for cancellation of a registered trademark.[5]

Section 33(b) of the Lanham Act established seven "defenses or defects" to a trademark, among which are:

(7) That the mark has been or is being used to violate the antitrust laws of the United States.

Both Senator Hawkes and Senator O'Mahoney emphasized that Section 33 (b) (7) meant exactly what it said. Senator Hawkes stated that "when the trade-mark is used to violate the antitrust laws, then such violation of the laws can be used as a defense against one who sues for infringement" (92 Cong.Rec. 7636).

It was in connection with Senator O'Mahoney's statement that the "clean hands" shorthand was used to explain the purpose and intent of the Congress. Senator O'Mahoney wanted to make clear that certain language in the Conference Report (printed at 92 Cong.Rec. 7522 for the House and at 92 Cong.Rec. 7635 for the Senate) "should not be interpreted as * * * narrowing the effect of a trademark violation of the antitrust law" (92 Cong.Rec. 7874).

---

5. Toulmin, in Section 27.1, 4 Toulmin's Anti-Trust Laws, page 762, comments on those two sections as follows: "It is significant that the Trade-Mark Act of 1946 specifically provides for the defense in a trade-mark infringement suit that the mark is being used to violate the anti-trust laws. Also, the Federal Trade Commission is given the power to apply for cancellation of any mark which has been obtained by fraud or is being used unlawfully." See also Toulmin's Conclusion stated in Section 27.39, ib. page 805: "Any attempt to use trade-marks as an instrument to effect monopoly or unreasonable restraint of trade will be met by action in court or by action of the Federal Trade Commission in conjunction with the Patent Office."

Senator O'Mahoney explained that Section 33(b) (7) was intended to incorporate the idea that "the holder of the trade-mark must come into court with clean hands" (92 Cong.Rec. 7874). The colloquy that immediately followed between Senators Hawkes, O'Mahoney, and Pepper, the three Managers of the Bill on the part of the Senate, made clear that all three were agreed that one's hands indeed became dirty if he used his trademark, to use Senator Hawkes' words, "as a part of the process of violating the antitrust laws" (92 Cong.Rec. 7874).

*Timken Roller Bearing Case*

Any Congressional fear that Section 33(b) (7) might be read narrowly was disspelled by the *Timken Roller Bearing* case.

Judge Freed, the trial judge, disposed of the contention that the Lanham Act might have rendered inapplicable the antitrust laws to a trademark misuse which was a part of a violation in a footnote. In United States v. Timken Roller Bearing Co., N.D.Ohio, 1949, 83 F.Supp. 284, in footnote 2 at 315, Judge Freed held:

> Whatever extension of trade mark rights is encompassed in the Lanham Trade-Mark Act, Title 15 U.S.C.A. § 1051 et seq., its enactment did not open the door to employ a trade mark as an instrument to undermine the antitrust laws. This is borne out with transparent clarity by its legislative history.

The Supreme Court affirmed in Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951). Defendant in *Timken*, as the defendants in this case, contended that "the restraints of trade * * * can be justified as 'reasonable,' and therefore not in violation of the Sherman Act, because they are 'ancillary' to the alleged 'main transactions' [and] an exercise of appellant's right to license the trademark 'Timken'" (341 U.S. at 597, 71 S.Ct. at 974).

Mr. Justice Black held that:

> [T]he restraints of trade [can not] be justified as reasonable steps taken to implement a valid trademark licensing system, even if we assume with appellant that it is the owner of the trademark "Timken." * * * [W]hile a trademark merely affords protection to a name, the agreements in the present case went far beyond protection of the name "Timken" and provided for control of the manufacture and sale of anti-friction bearings whether carrying the mark or not. A trademark cannot be legally used as a device for Sherman Act violation. Indeed, the Trade Mark Act of 1946 itself penalizes use of a mark "to violate the antitrust laws of the United States" (341 U.S. at 598-599, 71 S.Ct. at 975).

Section 33(b) (7) was cited in footnote 8 on page 599, 71 S.Ct., on page 975 to which Mr. Justice Black added "[t]he reason for the penalty provision was that 'trade-marks have been misused. * * * have been misused in connection with cartel agreements' 92 Cong.Rec. 7872."

Other District Courts in addition to those to which we have already referred have read the Lanham Act and followed *Timken* as we do. See Forstmann Woolen Co. v. Murray Sices Corporation, S.D.N.Y.1950, 10 F.R.D. 367 at 370 (where Judge Medina held that had defendant actually pleaded an anti-trust defense it would not have been stricken); Forstmann Woolen Co. v. Alexander's Dept. Stores, S.D.N.Y.1951, 11 F.R.D. 405 (in which Judge Leibell refused to strike an antitrust defense that had been properly pleaded); G. D. Searle & Co. v. Institutional Drug Distributors, S.D.Cal.1957, 151 F.Supp. 715 at 720, (in which Judge Yankwich held that the defendant did not prove its defense); Sanitized, Inc. v. S. C. Johnson & Sons, Inc., S.D.N.Y.1959, 23 F.R.D. 230 at 232 (in which Judge Bick refused to strike an alleged antitrust violation affirmative defense); and Gray Line, Inc. v. Gray Line Sightseeing Companies Assoc. Inc.,

N.D.Cal.1965, 246 F.Supp. 495 at 500 (in which Judge Wollenberg sustained plaintiff's motion for summary judgment in an antitrust case which was defended on the same theory that defendants attempt to defend the antitrust cases here involved).

Scholarly treatment of Section 33(b)(7) is in accord with the decided cases. See Galston, Some Aspects of the Lanham Trade-Mark Act, 6 F.R.D. 375 at 379; Comment on Quality Control and the Antitrust Laws in Trademark Licensing, 72 Yale L.J. 1170 (May, 1963); and Nicoson, Misuse of the Misuse Doctrine in Infringement Suits, 9 U.C.L.A. Law Rev. 76 at 96.

We have undoubtedly devoted more space to the misuses of trademark question presented by the stipulation than it deserves. We have done so because defendants' insistent position from the outset of this litigation in regard to that question had the effect of diverting focus away from the preparation of these cases for trial. Our direction of further proceedings will attempt to make up for lost time.

### Other Questions Presented

 In prior briefs filed before our predecessor judge, defendants submitted lengthy briefs in support of an argument that common ownership and control of corporations, as a matter of law, precludes a finding of a conspiracy violation under the antitrust laws. Questions VII and VIII presented by plaintiffs in the stipulation was in probable anticipation of defendants' renewal of that general argument. Defendants, indeed, in their recent briefs filed before us did give that question passing attention.

And passing attention is all that argument deserves. We hold the argument untenable under Kiefer-Stewart Co. v.

Joseph E. Seagram & Sons, Inc., 340 U.S. 211 at 215, 71 S.Ct. 259, 95 L.Ed. 219 (1951), and United States v. Bausch & Lomb Optical Co., 321 U.S. 707 at 723, 64 S.Ct. 805 (1944).

### Order Directing Further Proceedings

This case is hereby set for further pretrial conference on Monday, April 4, 1966, at 9:30 a. m. at Kansas City, Missouri.

The purpose of the next scheduled pretrial conference will be (a) to establish a time schedule for all discovery and to enter stipulations concerning the use of testimony already taken in this case or in any other proceeding, including the Federal Trade Commission; (b) to fix a date for the close of discovery; (c) to establish a time schedule for the preparation of pretrial factual and legal briefs, covering both liability, damages, and other relief in regard to both counts of the pleadings alleging antitrust violations; [6] (d) to consider questions of separation under Rule 42(b) of the Rules of Civil Procedure for trial of various issues in these cases, including the order in which such issues should be tried before the Court or before a jury; [7] and (e) to fix a date for trial.

In order that the conference proceed efficiently, counsel shall prepare, serve on opposing counsel, and file not later than March 25, 1966, a memorandum and suggested agenda for the conference. Such memorandum and agenda shall include (1) a list of witnesses each party expects to call for deposition or trial, together with a suggested schedule as to when and where depositions are to be taken; (2) a list of documents each party expects to adduce in evidence, together with a statement as to whether such documents have or have not already been inspected; and (3) the suggestions of

6. We are forwarding counsel a copy of an order recently entered in another antitrust case, State of Missouri and State Highway Commission of Missouri v. Stupp Bros. Bridge & Iron Co., et al., D.C., 248 F.Supp. 169, so that they will be presently advised of the type of order toward which the efforts of the scheduled pretrial conference will be directed.

7. See problem identified by Judge Leibell in *Forstmann Woolen Co.* and his solution at page 407 of 11 F.R.D. By this citation we do not indicate that our mind is closed to other possible solutions.

each party in regard to all matters that should be placed on the agenda for discussion and determination.

Counsel shall confer with each other in order to present as much of an agreed agenda as possible and to make at least tentative agreements in regard to depositions and further discovery. Should counsel be unable to agree, the points for the agenda rejected and schedules of depositions and discovery proposed shall be added to those upon which counsel are agreed.

It is so ordered.